FILED

2013 Mar-27  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EXPRESS OIL CHANGE, LLC**, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-10-BE-0263-KOB** |
| | ] | |
| **ANB INSURANCE SERVICES, INC.,** | ] | |
| **et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

This controversy arises from Plaintiff Express Oil's attempt to create a self-funded health benefits plan for its employees while eliminating any uninsured risk for itself by procuring stop-loss insurance. Express Oil employed and relied on Defendants ANB Insurance and Alan Wood to help it transition from a fully-insured to a self-funded health plan, design a suitable self-funded plan, and procure appropriate stop-loss insurance. Express Oil purchased a self-funded plan from Defendant Blue Cross, and Blue Cross administered the plan, which became effective in 2003. Express Oil allegedly believed that the self-funded plan had a $1 million dollar comprehensive lifetime maximum for each covered member and thus procured stop-loss insurance covering any member's claims that exceeded $75,000 up to the $1,000,000 dollar comprehensive lifetime maximum.

The genesis of this specific dispute is the birth of twins by one of Express Oil's employees. One of the twins was born with very serious medical issues and quickly amassed costly medical bills under Express Oil's self-funded plan. During the early years of the child's life, Express Oil paid over $2.8 million dollars in claims on the child. During the 2007–2008 policy year, Express Oil exhausted its $1,000,000 lifetime maximum stop-loss reimbursement benefits. Under the self-funded plan's definition of "lifetime maxmimum," however, many of the claims incurred by the child were

1

not subject to the self-funded plan's lifetime maximum, and Express Oil remained liable for the claims that exceeded the $1 million ceiling of the stop-loss insurance policy. Express Oil was exposed to this liability as a result of the misinterpretation of the self-funded plan's definition of "lifetime maximum" and its subsequent procurement of stop-loss insurance that did not fully cover it from the liabilities from which it had intended to protect itself.  In the instant lawsuit, Express Oil seeks to hold at least one of the Defendants liable for this costly gap in coverage.

This unusual ERISA case comes before the court on Defendants ANB Insurance Services and Alan L. Wood's Motion for Partial Summary Judgment (doc. 88); Defendant Nesbitt & Co.'s Motion for Summary Judgment (doc. 90); Defendant Blue Cross and Blue Shield of Alabama's Motion for Partial Summary Judgment (doc. 92); and Defendant Blue Cross and Blue Shield of Alabama's Motion to Strike (doc. 113). The parties have fully briefed ANB and Wood's Motion for Partial Summary Judgment and Blue Cross's Motion for Partial Summary Judgment. Plaintiffs Express Oil Change, LLC, and the Express Oil Change Group Health Care Plan (collectively "Express Oil") did not file a response to Nesbitt's Motion for Summary Judgment. The court has considered the parties' submissions and applicable law, and for the reasons explained below, concludes that Blue Cross's Motion to Strike is due to be granted in part and denied in part; Nesbitt's Motion for Summary Judgment is due to be granted in its entirety; Blue Cross's Motion for Partial Summary Judgment is due to be granted in its entirety; and ANB and Wood's Motion for Partial Summary Judgment is due to be granted as to Count VII for negligent procurement of insurance but due to be denied on Count XII for breach of fiduciary duty.

**I.      PROCEDURAL HISTORY AND COUNTS ALLEGED IN THE AMENDED AND RECAST COMPLAINT**

Express Oil Change, LLC filed this lawsuit on November 10, 2008 in the Circuit Court for Jefferson County, Alabama, against ANB Insurance Services, Inc.; S.S. Nesbitt & Co.; and Alan L. Wood. (Doc. 1-1, at 22).  On November 6, 2009, Express Oil Change amended the complaint and added Blue Cross and Unimerica Insurance Company as Defendants. Blue Cross removed the case to this court on February 3, 2010, based on this court's federal question jurisdiction over ERISA claims (doc. 1), and on March 24, 2010, Blue Cross filed a breach of contract counterclaim against Express Oil (doc. 15). On April 20, 2010, Express Oil Change, with the leave of court,  filed an "Amended and Recast Complaint" (doc. 24) which added the Express Oil Change Group Health Care Plan as a Plaintiff and added several new claims.  On February 16, 2011, Unimerica Insurance Company filed a motion for summary judgment (doc. 43), to which Express Oil elected not to file a responsive brief. The court granted Unimerica's motion for summary judgment and dismissed Unimerica with prejudice on April 20, 2011 (doc. 63), leaving Nesbitt, Blue Cross, ANB, and Wood as the remaining defendants.

The Amended and Recast Complaint alleges sixteen different counts. Counts I, II, III, IV, V, & VI are alleged against Blue Cross; counts VII, VIII, XI, & XII are alleged against Wood, ANB, and Nesbitt; counts IX & X are alleged against Wood only; and counts XIII & XIV are alleged against ANB and Nesbitt only. Counts XV & XVI are no longer in the case because they were alleged only against Unimerica, which this court dismissed, as stated above. (Doc. 63).

   A.      *Counts alleged against Blue Cross and by Blue Cross*

The Amended and Recast Complaint alleges the following counts against Blue Cross: Count I—breach of duty as an ERISA fiduciary; Count II —breach of contract; Count III— breach of the implied covenant of good faith and fair dealing; Count IV— negligent or wanton failure to properly

design the plan; Count V—negligent or wanton failure to properly administer, handle, process, and

pay claims under the plan; and Count VI—fraudulent suppression. In its answer, Blue Cross asserts

a breach of contract counterclaim against Express Oil, which is not addressed in this opinion.

> B.  *Counts alleged against Wood, ANB, and Nesbitt*

The Amended and Recast Complaint alleges the following counts against Wood, ANB, and

Nesbitt: Count VII—negligent or wanton failure to procure sufficient stop-loss insurance for Express

Oil; Count VIII—breach of an express or implied contract with Express Oil to provide expertise and

guidance regarding Express Oil's self-funded plan; Count XI—fraudulent suppression; and Count

XII—breach of fiduciary duties.

> C.  *Counts alleged against Wood only*

The Amended and Recast Complaint alleges the following counts against Wood: Count

IX—negligent or wanton breach of contract; and Count X —fraud.

> D.  *Counts alleged against ANB and Nesbitt only*

The Amended and Recast Complaint alleges the following counts against ANB and S.S.

Nesbitt —negligent or wanton failure to properly investigate, hire, train, supervise, and

retain Wood; and Count XIV—vicarious liability for the wrongful conduct of Wood.

## II.   STATEMENT OF FACTS[1]

> A.  *Background*

Before 2003, Express Oil had a fully-insured health plan for its employees. In 2002, Express

Oil contemplated changing to a self-funded plan, also known as a self-insured plan. Under a self-

---

[1] The court accepts this statement of facts, taken in the light most favorable to the plaintiff, for summary judgment purposes only. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) ("Even though the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case, our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff.") (citations omitted).

funded plan, an employer provides health benefits to its employees out of its own funds, in contrast to a fully-insured plan in which an employer pays fixed premiums to an insurance carrier, which in turn pays the health benefits of the employees. Self-funding has a number of benefits, among them increased flexibility in designing a health care plan and a potential reduction in cost.

That potential reduction in cost, however, is counterbalanced by an increase in risk resulting from unpredictable or catastrophic claims, which may be devastating to a smaller employer that may not have the financial resources to meet those obligations. To protect against these catastrophic claims, most self-funded employers purchase "stop-loss insurance." Stop-loss insurance is a separate contract between the employer and a stop-loss insurance carrier where the insurance company agrees to reimburse the employer for claims that exceed a certain level. Many of these stop-loss contracts, however, also provide for a ceiling on the amount of reimbursement an employer may receive. In addition to procuring stop-loss insurance, many self-funded employers also contract out the administration of their employees' claims to a third-party administrator.

Blue Cross supplied Express Oil with the self-funded plan that Express Oil ultimately used in administering health benefits to its employees. The plan limited the amount of benefits that Express Oil covered members could receive, a term known as the "lifetime maximum." A "covered member" is any Express Oil employee who subscribes to the plan and any eligible dependents.  Def. Blue Cross Ex. 4, 2007 SPD, at 44.  Under the lifetime maximum, Express Oil employees were eligible for up to $1,000,000 in lifetime benefits for every covered member; however, as defined under the plan, this cap applied only to *some* services, such as out-of-network services, or services not provided by a hospital, physician, or provider with which any Blue Cross and/ or Blue Shield plan has a Preferred Provider Organization ("PPO") contract for the furnishing of health care services.  The plan did not set any limitation on the benefits a member could receive for in-network

services, or services provided by a hospital, physician or provider with which any Blue Cross and/or Blue Shield plan has a PPO contract.

Express Oil, however, apparently understood that the plan would provide a *comprehensive* lifetime maximum of $1,000,000 for *all* services to its members, an understanding that factored into the way Express Oil procured stop-loss insurance. Because Express Oil believed that it would only be exposed to $1,000,000 in claims for any one covered member, it procured stop-loss insurance with a specific deductible of $75,000 per covered member per year and a $1,000,000 per covered member lifetime maximum reimbursement. Thus, under its stop-loss insurance contract, Express Oil would pay up to $75,000 per covered member per year for its members' claims; if any one member's claims exceeded $75,000, then the stop-loss carrier would reimburse Express Oil that amount, but only up to $1,000,000 over the life of the member.

Express Oil did not realize that this self-funding plan and stop-loss insurance arrangement left a gap where Express Oil could be exposed to unlimited liability if a covered member used over $1,000,000 of in-network services. This gap became starkly visible when an Express Oil employee's wife, a covered member, gave birth prematurely to twins, also covered members, incurring catastrophic claims that, over several years, significantly exceeded the $1,000,000 ceiling on Express Oil's stop-loss insurance.

This gap in risk exposure—and who is at fault for its existence—underlies this lawsuit. Express Oil alleges that four different entities or individuals are liable: ANB Insurance Agency, the agency that assisted Express Oil in moving to a self-funded plan and helped it procure stop-loss insurance; Alan Wood, an ANB employee and the agent who assisted Express Oil with its self-funded plan and stop-loss insurance; S.S. Nesbitt, the insurance agency that acquired ANB's assets in 2007 and that hired Wood after the acquisition; and Blue Cross Blue Shield, which provided

Express Oil with and administered its self-funded plan.

      B.     *Express Oil's transition to a self-funded plan*

Before 2003, Ricky Brooks, the Chief Executive Officer of Express Oil, developed a personal relationship with Richard Pardue, an insurance broker who worked at ANB Insurance in 2003. Brooks and Pardue established a relationship and routinely saw each other socially. Their relationship before 2003 extended into the business realm as well, as Pardue and Brooks invested money together in a new Express Oil store in Tarrant, Alabama. Before 2003, Pardue also served as Express Oil's agent for its property and casualty insurance and its worker's compensation coverage. In November 2001, Pardue left HRH, an insurance agency, to run and develop Alabama National Bank's insurance operation, ANB Insurance Services.

In 2002, Ronnie Hill, a self-employed insurance agent, made an unsolicited phone call to Greg Glover,  Express Oil's Chief Financial Officer, Secretary, and Treasurer, to talk with Glover about the concept of a self-funded insurance plan. According to Glover, Hill discussed a concept which involved "more risk than a fully insured plan," but that "might save some money over time." Depo. Gregory Glover 83:15--83:17 (Oct. 7, 2009) (Depo. Glover I). Hill suggested to Glover that Express Oil contact Blue Cross about the administrative services that Blue Cross could provide to a self-funded plan.

Glover contacted Blue Cross in 2002, asking about the fees associated with a self-funded plan and requesting a report. In response, Blue Cross provided a claims experience report and a rate for administering the self-funded plan. At that time, Express Oil decided not to switch to a self-funded plan, however, because United Healthcare had given Express Oil a quote for a fully-insured plan that was less expensive than Express Oil's then fully-insured plan with Blue Cross, and also because the subject of the self-funded plan "just seemed so complex and no longer worthy of [Glover]'s time."

Depo. Glover I 94:13--94:14.

In 2003, Express Oil contacted ANB Insurance (now operating as Nesbitt and Co.).  Greg Glover and Ricky Brooks met with ANB employees Richard Pardue and Alan Wood to discuss transitioning from a fully-insured health plan to a self-insured plan. Glover testified in deposition that "[Wood] was presented as the benefits expert at the agency and was experienced in the concept [of the self-funded plan]." Depo. Glover I 120:12–120:15. Glover's observation accords with Pardue's own testimony that Wood was the ANB employee with expertise in the area of stop-loss insurance regarding self-funded plans.

According to Glover, the 2003 meeting "eventually resulted in a self-funded plan for Express Oil Change where ANB was the agent on the stop-loss and from our perspective was our consultant on the overall issue." Depo. Glover I 120:18–120:21. Glover asked Wood for help with the plan design, and Glover understood that Wood was helping Express Oil form a self-funded plan. After Glover and Brooks decided to go with a self-funded plan, Wood and Glover began communicating with Blue Cross about options for a self-funded insurance plan, although Glover never had a face-to-face meeting with anyone at Blue Cross. Glover understood that Blue Cross offered various plan options and gave a lot of flexibility in designing the plans, based in part on his experience with Blue Cross when it fully-insured Express Oil.

At some point during June or July 2003, Glover requested that Blue Cross provide him a summary of what Blue Cross could set up as a self-funded plan. Blue Cross supplied Express Oil with two examples of self-funded plans in July 2003. In addition to the Blue Cross-supplied plans, Wood also provided Glover with more generalized examples of self-funded plans in response to Glover's request for "help and advice just in general to plan design issues." Depo. Glover I 146:21–146:23.  In Glover's communication with Blue Cross he corresponded with Stephanie

Talbot, a marketing representative at Blue Cross, about how he wanted to design Express Oil's self-funded plan, and discussed issues such as co-pays for doctor's visits and prescription card co-pays or deductibles.

### 1.   The Plan Benefits Comparison Chart

The plan comparison that Blue Cross provided in July 2003 was a chart comparing the "Personal Choice Benefits" and the "BlueCard PPO" plans. The chart indicated, for both plans, that the "Lifetime Maximum" was $1,000,000 per person. The definition of the lifetime maximum in this chart did not limit the lifetime maximum to certain services nor did it state that the lifetime maximum was comprehensive.

Although Glover could not specifically recall which of the proposed Blue Cross plans Express Oil ultimately used, he believed they used the "BlueCard PPO" plan. Glover testified that in his discussions with both Blue Cross and Wood, he never discussed specifics of the plan as it related to the lifetime maximum.

### 2.   The 2003 Summary Plan Description, updated annually

Before the self-funded plan went into effect on October 1, 2003, Blue Cross provided Glover with a document, the Summary Plan Description ("SPD"), that summarized the benefits the plan would make available to Express Oil employees. Although Glover could not specifically recall whether the document he received was the 2003 SPD, Glover understood the document he did receive reflected the terms of Express Oil's plan that were to apply to the employees. The 2003 SPD included a definition of the "Lifetime Maximum," which was the same definition included in Express Oil's previous fully-insured plan with Blue Cross. The 2003 SPD defined the Lifetime Maximum as

> $1,000,000 lifetime maximum for each covered member; **applies only to** Other Covered Services, Non-PPO Outpatient Hospital Services, Non-PPO Physician

Services, Mental Health and Substance Abuse Physician Services unless otherwise stated.

Ex. 3, 2003 SPD at 6 (emphasis added). Because the lifetime maximum is defined to apply only to certain services, any service not enumerated in that definition has no limitation on the lifetime amount that a covered member can incur. Thus, under Express Oil's plan, as summarized in the SPD, no lifetime maximum applied to benefits for services that were provided through the Blue Cross network—PPO services—and that were not "Other Covered Services."

Some of the "Other Covered Services" were defined in a separate table in the 2003 SPD. The table also includes a footnote stating that "[m]ost other covered services are paid at 80% of the Allowed Amount after the calendar year deductible is met." Def. Blue Cross Ex. 3, 2003 SPD at 7. The 2003 SPD later enumerates a full list of "Other Covered Services." Number 15 in that list says "Physician's Covered Services. Surgery includes preoperative and postoperative care, reduction of fractures and endoscopic procedures, maternity deliveries and heart catherization." Def. Blue Cross Ex. 3 at 22.

From 2003 to 2008, Express Oil renewed its self-funded plan with Blue Cross, and each year around October Blue Cross issued a new SPD. Each year Blue Cross accompanied the updates with a letter informing Glover that it was printing the annual SPD. Blue Cross produced letters from 2004 to 2007 where Glover indicated on the letter that the SPDs were "Approved as Written" and signed the letter.

The record reflects that no meaningful differences existed between these SPDs until 2007. In 2006, Blue Cross issued an SPD in the middle of the plan's year, although Glover could not recall why nor could he recall any changes that occurred in the plan. Although Blue Cross issued the 2006 SPD mid-year, the 2006 SPD appears identical to the 2003 SPD. In 2007, Blue Cross issued a more substantial update to its SPD, although Blue Cross claimed that the changes were all in formatting.

### 3.   The Benefits Summary

In addition to the 2003 SPD, Blue Cross also provided Express Oil with a Benefits Summary. The Benefits Summary, created on August 11, 2003, and revised on September 15, 2003, also provided the same definition of the lifetime maximum as in the 2003 SPD. Glover testified in deposition that he recalled receiving the Benefits Summary, but that he did not know whether it was provided to him before the plan went into effect on October 1, 2003.

### 4.   Glover executes the document making the self-funded plan effective and the Administrative Services Agreement

On September 26, 2003, Glover signed Blue Cross's plan description document, which indicated that the plan would become effective on October 1, 2003. The plan description document did not include a detailed definition of the lifetime maximum, instead stating under subheading "F. Major Medical Benefits" that Express Oil's plan provided a $1,000,000 maximum lifetime benefit. Def. Ex. 11 to Depo. Glover I at 4. Glover had the opportunity to read the document before he signed it, although he could not recall in his deposition whether he had read the document. Glover testified that changes were made to the plan over time, including at time periods other than renewal, and that benefits were added to the plan at his request.

On December 11, 2003,  Glover also executed an Administrative Services Agreement ("ASA") with Blue Cross setting out each parties' obligations and responsibilities with respect to the self-funded Express Oil plan. The 2003 ASA defined Blue Cross as the "Claims Administrator" and Express Oil as the "Plan Sponsor" and "Plan Administrator," and provided that Blue Cross, as Claims Administrator, "shall administer the benefits provided by the Plan . . . subject to all of the terms and conditions of the Plan . . . ." Ex. 1, 2003 ASA at 1. The 2003 ASA also included a "hold harmless" provision, which provided in relevant part that Blue Cross's execution of the ASA "shall not be deemed as the assumption by the Claims Administrator of any responsibility other than the

11

provision of Administrative Services only as specified [in the ASA]." Ex. 1, 2003 ASA at 4.

### C.    *Express Oil's procurement of stop-loss insurance*

Express Oil's only discussions about stop-loss insurance during the first year of the self-funded plan's existence were with Wood. Glover did not discuss stop-loss proposals with anybody at Blue Cross during 2003 or 2004. Express Oil, with Wood as its agent, first procured "Specific Excess Loss Insurance" from Monumental Life Insurance Company, effective beginning October 1, 2003. Under the stop-loss policy with Monumental, Express Oil received coverage of up to $1,000,000 per covered person with a specific deductible per covered person of up to $75,000. Thus, under this stop-loss policy, Express Oil paid a premium for each covered member in exchange for reimbursement by Monumental for any covered member's claims that exceeded $75,000. Glover testified that his belief that the plan had a *comprehensive* lifetime maximum per covered member of $1,000,000 factored into the decision to procure stop-loss insurance that only covered up to $1,000,000.

Beginning in 2004, Express Oil obtained proposals for stop-loss insurance each year from other agents, in addition to ANB Insurance and Wood, before it purchased stop-loss insurance. Notwithstanding the additional proposals, Express Oil decided to renew its stop-loss coverage with Monumental for 2004 with the same $75,000 specific deductible and the same coverage.

### D.    *Blue Cross sends Express Oil stop-loss insurance proposals in 2005*

In 2005, Blue Cross provided Express Oil with a stop-loss proposal from Companion Life Insurance Company. Glover forwarded the proposal to Wood but did not look at it himself. Companion Life's stop-loss proposal suggested coverage of $2,000,000, an amount that Glover admitted in deposition would not have been necessary if the plan benefits were capped at $1,000,000 for all services. To the extent Glover discussed stop-loss proposals with the Blue Cross marketing

representatives, he testified that he had "very limited discussions" with them because they were "clearly uncomfortable in [that] arena." Depo. Greg Glover 75:18–75:20 (Aug. 5, 2011) ("Depo. Glover II"). Ultimately, Express Oil renewed its stop-loss coverage in 2005 with Monumental, which at some point became Unimerica, with the same $75,000 specific deductible and $1,000,000 lifetime maximum reimbursement per covered member.

      E.      *The Inception of the Q claim*

In May 2006, the wife of one of Express Oil's employees, "Mr. Q," had twins that were born prematurely. One of the twins was born with a serious medical condition, and the child's health conditions resulted in substantial medical claims totaling $378,047.00 for the plan and policy year October 1, 2005 – September 30, 2006 (the court shall refer to this claim, and others incurred by Mr. Q, as the "Q claim"). After Express Oil exhausted the $75,000 deductible, it received $303,047.00 in stop-loss insurance reimbursement benefits under its stop-loss insurance policy with Unimerica for the Q claim Express Oil paid in that plan and policy year.

      F.      *Express Oil's Stop-Loss Coverage in 2006, and the continuing accrual of the Q claim*

In September 2006, Express Oil renewed its stop-loss coverage and accepted Unimerica's proposal for $1,000,000 in lifetime benefits per covered member. Because the stop-loss insurance issued for a self-funded group plan in Alabama is obtained on an annual basis and subject to underwriting review each year, any covered member with medical claims that continue over several years may be "lasered," *i.e.*, excluded from insurance coverage or subject to a higher deductible for each subsequent policy year. Thus, when Express Oil renewed its stop-loss coverage with Unimerica after the first year the Q claim accrued, Unimerica lasered the Q claim by increasing the specific deductible for the Q child to $195,000 for that year.

Blue Cross also provided Express Oil with another stop-loss proposal from Companion Life

in 2006. That proposal indicated that it was based on Express Oil's current plan using the Blue Cross network. Blue Cross also provided Express Oil a stop-loss proposal from Lloyds of London in 2006, which required a $350,000 specific annual deductible for the Q claim. Glover could not recall discussing either of the 2006 proposals with anybody at Blue Cross, and ultimately renewed the stop-loss coverage with Unimerica.

Throughout the October 1, 2006 – September 30, 2007 policy year, the Q claim continued to accrue, and Express Oil paid medical claims of $850,972.62 through its plan for the Q child. After exhaustion of the required deductible amount, Unimerica provided $627,003.22 in stop-loss reimbursement benefits.

G.   *Express Oil's Stop-Loss Coverage in 2007, the 2007 updates to the SPD and ASA*

In 2007, Express Oil renewed its stop-loss insurance with Unimerica, accepting a proposal that provided for $1,000,000 in lifetime benefits per covered member, with an increase in the Q child's specific annual deductible to $225,000. During the October 1, 2007 – September 30, 2008 policy year, Express Oil paid medical claims in excess of $1.5 million for the Q child. Under the stop-loss policy, Unimerica only provided $69,948.78 in stop-loss reimbursement benefits to Express Oil because it had exhausted its $1,000,000 lifetime maximum stop-loss reimbursement benefits for the Q claim.  Because much of the Q claim resulted from medical services not subject to the Express Oil plan's lifetime maximum, Express Oil remained liable for much of the Q child's claims that exceeded the $1,000,000 ceiling in Unimerica's stop-loss insurance policy.

On November 17, 2007, Glover wrote to a Blue Cross employee, Mark McLaughlin, explaining that Glover had been informed that the Q claim had hit the $1,000,000 mark, which would end the stop-loss carrier's liability. Glover asked whether Express Oil's plan indeed had a $1,000,000 lifetime maximum and whether that maximum would affect Blue Cross's payments on

the Q claim. Mr. McLaughlin responded by quoting the pre-2007 SPDs' definition of the lifetime maximum, explaining that the maximum did not apply to PPO services provided by a PPO provider. Glover states that this e-mail was the first time he learned that Express Oil's plan did not have a comprehensive lifetime maximum.

In 2007, Blue Cross also issued a new SPD that appeared different from the 2006 SPD. Mary Bell, an employee with Blue Cross's Customer Benefits Administration, explained that Blue Cross, in connection with a software upgrade, reformatted its "template" plan documents. According to Blue Cross, the changes were intended to make the SPD more user-friendly by putting all the relevant information on a topic in one place. Some of the language in the plan also changed, although an operations manager in Blue Cross's Claims Department, Jeremy Dennis, testified that the changes were not substantive. Specifically, Dennis testified that the SPD did not introduce any changes into how the lifetime maximum was calculated, what services were applicable to the lifetime maximum, and the 365 day inpatient hospital limit.

Although Dennis testified that the 2007 SPD did not change how the lifetime maximum was calculated, the language about the lifetime maximum did change. Before 2007, the lifetime maximum was defined as a $1,000,000 maximum benefit that applied only to certain services. *See supra* Part I.B.2. In the 2007 update, the SPD defined the lifetime maximum in two separate parts of the document. First, under the heading "COST SHARING," the 2007 SPD stated that the lifetime maximum was $1,000,000. 2007 SPD at 8.

Later under the "Lifetime Maximum" subheading,  the 2007 SPD stated:

The lifetime maximum benefit for each covered member under the plan is specified in the table above. The lifetime maximum is the maximum amount each covered member is eligible to receive for applicable covered services in his or her lifetime. Lifetime maximum amounts are accumulated from claim payment amounts under the plan and prior or subsequent plans or contracts issued to your group by us.

The lifetime maximum generally applies to services or supplies that are subject to the calendar year deductible. It may also apply to certain other services and supplies, depending upon specifications from your group.

The following are some examples that generally apply to the lifetime maximum:
• Certain other covered services and supplies;
• Out-of-network outpatient hospital services (except treatment of accidental injury rendered within 72 hours);
• Out-of-network physician services

2007 SPD at 9.

When Blue Cross issued the reformatted SPD, its Customer Benefit Administration sent each group a letter along with the SPDs for approval. In the letter to Express Oil, dated December 11, 2007, Blue Cross stated:

We remind you that you are the "plan administrator" and "plan sponsor" under ERISA . . . and/or the terms of your plan. Among other things, this imposes upon your group the sole legal responsibility to . . . (iii) ascertain that the booklet accurately and fully describes the benefits that you intend for us to provide or administer. . . . Nothing in our agreements with you and no actions taken by us are intended to delegate any of these responsibilities under the plan or applicable law to us.
. . . .
Your acceptance of our provision of benefits under the plan to your employees and their dependents constitutes your group's acceptance of the terms of this letter and an affirmative direction to us to administer benefits as provided for herein.

Def. Blue Cross Ex. 12 at 2. Kathy Palmer, Express Oil's Director of Payroll, signed this letter on January 9, 2008.

Blue Cross also updated its ASA in 2007. The 2007 ASA stated that the Claims Administrator, Blue Cross, would "exercise the discretionary fiduciary authority to process and adjudicate claims under the Plan." Def. Blue Cross Ex. 2 at 3. The 2007 ASA further explained that this discretionary fiduciary authority "encompasses all determinations and findings necessary to process and adjudicate claims, such as the discretionary authority to construe and apply the Plan . . . ." Def. Blue Cross Ex. 2 at 3. The 2007 ASA included a section titled "Stop-Loss Insurance,"

16

specifically providing that the "Employer is responsible for selecting and maintaining in force, if desired, suitable stop-loss insurance coverage." Def. Blue Cross Ex. 2 at 5. The 2007 ASA also provided that the "Claims Administrator is entitled to rely on instructions, communications, or directions from the Employer concerning Plan design . . . and other areas of Plan administration for which the employer is responsible." Def. Blue Cross Ex. 2 at 9.

     H.     *Blue Cross's administration and payment of claims*

During the relevant time period, Jeremy Dennis was the operations manager for claims administration in the group account area at Blue Cross. Dennis testified that Blue Cross administers claims based on the SPD, and that the internal systems are coded based on the SPD to determine what benefits applied to each group. Dennis also testified that the SPD in its entirety demonstrated what services were covered under "Other Covered Services," as that term is referenced in the definition of the lifetime maximum. Specifically, Dennis emphasized that the footnote under the table of "Other Covered Services" that stated that "Most Other Covered Services are paid at 80% of the Allowed Amount after the calendar year deductible is met" brought within the scope of "Other Covered Services" any service listed in the SPD that is paid at 80%. 2006 SPD at 7.

     I.     *The Q claim audit and Blue Cross's credit to Express Oil*

Between May 2006 and October 2008, the total paid claims for the Q claim exceeded $2,800,000. Although Glover testified that he "would not pretend to be able to see a problem with how [Blue Cross] adjudicated the [Q] claim," his new agent, Wade Bice, advised him to hire somebody to audit the Q claim. On Bice's advice, Express Oil retained Northshore International Insurance Services as consultants and auditors to evaluate how Blue Cross administered the plan to determine if Blue Cross had overpaid the Q claim under Express Oil's plan.

Northshore consultants Adria Garneau and Tammy Burns evaluated Blue Cross's handling

of the Q claim and prepared two reports. The first report, dated August 3, 2009, was based on the 2006 SPD and Blue Cross business records. The supplemental report, dated August 28, 2009, incorporated the 2007 SPD.

In the August 3, 2009 report, Northshore determined that Blue Cross paid a total $2,854,928.14 in Q claims. Of this sum, Northshore determined that Blue Cross had paid $1,277,699.09 for services subject to the $1,000,000 lifetime maximum; Northshore, thus, concluded that Blue Cross had overpaid the Q claim by $277,669.09. Blue Cross alleges that this report, however, did not apply all the terms of the plan, and Garneau qualified the report as being formed on the basis of an incomplete ability to determine which physician services were in-network or out-of-network. While the report did exclude hospital stays less than 365 days from the calculation of the lifetime maximum, it included in-network physician services, which, according to Blue Cross, were not subject to the lifetime maximum. Northshore decided to include in-network physician services based on its interpretation of the 2006 SPD's definition of the lifetime maximum. Specifically, Northshore concluded that the definition of lifetime maximum in the 2006 SPD stated that it applied only to certain services, including "Other Covered Services," and, in turn, that the SPD's section on "Other Covered Services" included "Physician's covered services." Garneau could not recall applying the 2007 SPD when calculating the overpayment in the August 3, 2009 report.

Northshore revised its overpayment calculation in the August 28, 2009 report, concluding that Blue Cross had paid only $84,584.10 over the $1,000,000 lifetime maximum for the Q claim. Garneau stated that to the best of her recollection, the difference between the August 3 and August 28 reports was the application of the 2007 SPD. Thus, the August 28, 2009 report excluded all physician services, both in- and out-of-network, after October 1, 2007 from the lifetime maximum, but still included in-network physician services before October 1, 2007, based on Northshore's

opinion that the 2006 SPD did not clearly outline which covered services would apply to the $1,000,000 lifetime maximum. Northshore, thus, calculated the overpayment by applying all pre-2007 physician services toward the lifetime maximum, except for inpatient hospital services that exceeded the 365-day inpatient hospital limit. Because Blue Cross asserts that in-network physician services should not have counted towards the lifetime maximum, it states that Northshore's overpayment calculation would be reduced even further if these services were excluded from the lifetime maximum.

In early 2009, Blue Cross determined that it had overpaid the Q claim subject to the $1,000,000 cap, and gave Express Oil a return credit for approximately $110,000. Dennis, Blue Cross's operations manager, testified in deposition that the overpayment had resulted from a reporting error.

J.      Termination of the Plan

In October, 2008, Express Oil elected to terminate its self-funded plan and return to a fully-insured plan. Blue Cross did not offer to insure Express Oil under a fully-funded plan, and Express Oil terminated its self-insured plan with Blue Cross.

K.      Nesbitt acquires the assets of ANB Insurance

In May 2007, Nesbitt acquired the assets of ANB Insurance under an Asset Purchase Agreement. Section 3.2 of the Asset Purchase Agreement provided that Nesbitt would not assume any of the liabilities of ANB Insurance arising out of any events occurring before the Effective Time for acquisition in May 2007, except as expressly included in the Asset Purchase Agreement. ("Asset Purchase Agreement," Doc. 89-1, at 11). Nesbitt also hired Wood in May 2007, after it acquired the assets of ANB Insurance. Before it purchased the assets of ANB in May 2007, Nesbitt was not at all involved with selling insurance or providing any services to Express Oil.

  L. *Alleged roles of the parties in designing Express Oil's plan and procuring stop-loss insurance*

    1. *Responsibility for designing or advising on the lifetime maximum*

  One of the central disputes in this case surrounds the lifetime maximum and whether Blue Cross was responsible for advising and explaining the operation of the lifetime maximum in the plan to Express Oil. The definition of Blue Cross's lifetime maximum, as it existed from 2003 to 2007, is present in two different documents about which Glover was questioned in his deposition: the 2003 SPD and the Benefits Summary. Blue Cross also provided Express Oil with two different documents that did not provide the definition of lifetime maximum limiting it to "other covered services" and out-of-network services, but instead only stated that the lifetime maximum was $1,000,000: the plan benefits comparison chart Talbot provided to Glover in July 2003 and the application to establish a new group plan signed by Glover in September 2003.

  T. Wayne Bowling, Express Oil's expert witness and a vice president at the insurance brokerage firm Willis of Alabama, submitted an expert report stating that he became aware, as early as 1999, "that the standard Blue Cross Blue Shield of Alabama PPO plan design had a feature that was different and unique from other carriers and [third-party administrators]." Expert Rpt. Wayne Bowling at 2. This "different and unique" feature was the lifetime maximum that did *not* apply to all covered charges, unlike most plans up until the mid-2000s "that included a $1,000,000 lifetime maximum for ALL covered charges." Expert Rpt. Wayne Bowling at 2. Thomas Yeary, Blue Cross's expert witness and an insurance broker with forty years experience, also acknowledged that Blue Cross had a unique plan, explaining that "Blue Cross contracts have always contained an unusual lifetime maximum provision," and that "[k]nowledgeable employee benefits brokers are aware of this unique feature of the Blue Cross Contract." Expert Rpt. Thomas Yeary at 2.

  Some of the witnesses also acknowledged that Blue Cross customers—specifically CFOs or

other management personnel responsible for an employer's self-funded plan—could reasonably misunderstand Blue Cross's lifetime maximum provision, believing it to be a comprehensive limitation. Bowling testified that although "an average intelligent person that reads [the provision on lifetime maximum benefits] could understand it," his experience was that most people did not understand it. Depo. Wayne Bowling 175:3–175:6. Bowling also stated that, "The majority of the employers that I met with were not aware that this lifetime limit did not apply to all charges . . . . In my experience, I found that without their broker, agent or consultant pointing it out to them; [*sic*] it is unlikely that the average Employee Benefit manager, Human Resource director or Chief Financial Officer would be aware of this benefit." Expert Rpt. Wayne Bowling at 2–3. Similarly, Mark McLaughlin, who worked as both a marketing representative and a service representative for Blue Cross, testified that he sometimes dealt with customers who would not comprehend that the lifetime maximum applied only to certain services, instead believing that it was a comprehensive limit. Express Oil's executives fell into the category of those who did not understand the lifetime maximum, as both Glover and Brooks stated that they believed that the plan had a $1,000,000 comprehensive lifetime maximum for all services when the plan became effective.

Bowling also testified that Blue Cross had no responsibility to advise an employer on how the lifetime maximum applied to certain services if Blue Cross did not supply lifetime coverage. He stated in his expert report that "[i]f the employer chooses to self insure the entire risk, it is the role of the broker or consultant to inform them of that risk."

Express Oil, however, cites to evidence that Express Oil argues shows that Blue Cross's normal practice was to explain the limited $1,000,000 lifetime maximum to customers. Bill Kerley, an Assistant District Manager at Blue Cross, testified that Blue Cross would normally undertake to go over the lifetime maximum with customers at initial sales presentations, where Blue Cross would

cover the benefits of the self-funded plan in detail. In response to this evidence, Blue Cross emphasizes that Kerley's testimony applied to initial sales presentations, which Blue Cross did not do with Express Oil in this case. Blue Cross also cites to the testimony of Clay Steed, a marketing service representative at Blue Cross at the time Express Oil switched to a self-funded plan, who testified that he would not proactively bring up the lifetime maximum when Blue Cross "already had the business." Depo. Clay Steed 123:12–13.

Express Oil also cites to the testimony of Thomas Byrd, ANB's expert witness and a founder of a third-party administrator firm that specializes in self-funded ERISA programs; Byrd stated that Blue Cross's SPDs made it very difficult to identify which services fell within the scope of "Other Covered Services" that applied towards the lifetime maximum. Mary Bell, a Blue Cross employee in Customer Benefits Administration, explained why Blue Cross could not offer an exhaustive definition of the lifetime maximum in its plan documents. Specifically, she stated that because Blue Cross could not know how it would process a claim until it received the claim, Blue Cross could not list everything that would go towards the lifetime maximum.

### 2. *Responsibility for plan design and cost*

Blue Cross cites to Express Oil's expert, Bowling, who stated that Express Oil's broker, ANB, had the responsibility of knowing Express Oil's objectives regarding plan design and cost and helping Express Oil make decisions regarding the plan. Bowling further stated that the broker's role also includes advising the client of the risk of the non-comprehensive lifetime maximum and offering coverage or a way to mitigate risk by redesigning the plan.

### III.   MOTION TO STRIKE

When Blue Cross filed its reply brief, it contemporaneously filed a motion to strike Glover's affidavit (Pl. Ex. 36) and a portion of Garneau's affidavit (Pl. Ex. 51) that Express Oil submitted

with its opposition brief. Blue Cross argues that the statements it moves to strike are either contradictory or inconsistent with these witnesses' prior sworn deposition testimony.

A.    *Standard of Review*

The Eleventh Circuit has held that "a party cannot give 'clear answers to unambiguous questions' in deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987). When a party does so, "the court may disregard the affidavit as a sham." *Id.* The Eleventh Circuit clarified that courts are to "apply this rule sparingly because of the harsh effect this rule may have on a party's case," because allowing "every failure of memory or variation in a witness' testimony to be regarded as a sham would require far too much from lay witnesses and would deprive the [jury] the traditional opportunity to determine which point in time and with which words the affiant was stating the truth." *Id.* To disregard an affidavit, the court must find "some inherent inconsistency" between the deposition testimony and the affidavit. *Id.*

B.    *Discussion*

1.    *Greg Glover*

Blue Cross focuses on two paragraphs of the affidavit of Greg Glover, Express Oil's Chief Financial Officer, as inconsistent with his deposition testimony. In paragraph three of his affidavit, Glover states that Blue Cross provided him with a "benefit comparison" chart, which did not explain Blue Cross's lifetime maximum. He further states in this paragraph that "[t]his was the document that I reviewed and used to compare the benefits we had under our existing United Healthcare plan." Aff. Gregory Glover ¶ 3. In the next paragraph, Glover states that "[w]hile Express [Oil] was considering moving to a self-funded plan, I do not believe I ever had a discussion with anyone at Blue Cross about the $1,000,000 lifetime maximum per member or saw any document that explained

how the $1,000,000 maximum per member actually worked." Aff. Gregory Glover ¶ 4. As the court reads Blue Cross's motion to strike, it interprets Glover's affidavit as stating that he did not receive any documents before the plan went into effect that explained the lifetime maximum.

Blue Cross asserts Glover's deposition testimony contradicts these statements; in his deposition testimony, Glover speaks in more uncertain terms about the documents he relied upon. For example, in his deposition Glover authenticated an application he signed to establish a new group plan. Blue Cross also cites to portions of Glover's deposition where he testified that he may have received other documents, such as the 2003 SPD or the Benefits Summary, that explained that the lifetime maximum was limited, and not comprehensive. In his first deposition, Glover testified that he recalled receiving a booklet from Blue Cross in the fall of 2003 and that he recalled receiving a document similar to the 2003 SPD before Express Oil's plan became effective. More significantly, Glover testified that although he could not remember when he looked at the provisions relating to the lifetime maximum, he recalled reviewing the provisions of the lifetime maximum some time before the plan became effective. Depo. Glover I 191:12–192:12. Later in his deposition, Glover also equivocated on what documents he received from Blue Cross, testifying that he was unable to say whether he received the 2003 SPD and that he could not emphatically state that the benefits comparison was the only document he read before the plan became effective.

Upon review of Glover's deposition testimony and affidavit, the court disagrees that his affidavit is inherently inconsistent with his testimony, largely because the court interprets Glover's affidavit differently than Blue Cross does. The court reads paragraph three of Glover's affidavit as stating that the primary document upon which he relied in *comparing* the proposed benefits of Blue Cross's plans to United Healthcare's was the benefits comparison chart. The court does not read this statement to mean that the only document Glover received or read was the benefits comparison chart.

24

Similarly, the court reads paragraph four  more narrowly than Blue Cross. Glover states in that paragraph that he did not *believe* he ever saw a document that explained how the $1,000,000 lifetime maximum actually worked while Express Oil was *considering* moving to a self-funded plan. As the court reads this statement, Glover's affidavit does not preclude that Express Oil received the SPD or Benefits Summary after Express Oil *decided* to create its self-funded plan, or that Glover received documents containing, but not necessarily fully explaining, the definition of the lifetime maximum, even if he does not *believe* that he did.[2]   Under this interpretation, even Glover's admission that he read the language regarding the definition of lifetime maximum contained in the SPD or Benefits Summary before October 1, 2003 is not inconsistent with his affidavit, because Glover could have read that language after Express Oil decided to create the self-funded plan—*i.e.*, after it moved beyond the point of considering its self-funded plan to executing the plan.

Thus, the court concludes that the affidavit contains enough qualifying language as to render it benign, such that it does not create any new genuine issues of material fact that Blue Cross seems to fear.  Ultimately, the court reads Glover's affidavit as stating less than what both Blue Cross and Express Oil interpret it to mean, and, accordingly, DENIES Blue Cross's motion to strike Glover's affidavit. In doing so, the court emphasizes that it does not read the affidavit as creating a genuine dispute of material fact that Glover did not receive any plan documents containing the description of the lifetime maximum. That Glover may not have recalled reviewing the documents does not negate his testimony that Express Oil received at least some document detailing the plan benefits, including the lifetime maximum, before October 1, 2003, even if Glover did not read or comprehend

---

[2] Even if Mr. Glover did receive documents containing the definition of the lifetime maximum, those documents presumably did not fully explain how the lifetime maximum worked. As Blue Cross employee Mary Bell testified, Blue Cross could not offer an exhaustive explanation of the lifetime maximum in its plan documents. *See supra* part I. L.1.

the document. Moreover, Glover's testimony does not negate that the 2003 SPD and the Benefits Summary contain the definition of lifetime maximum at issue in this case, even if Glover *believes* that he did not see such a document.

    2.    *Adria Garneau*

Blue Cross moves to strike two paragraphs of the affidavit of Northshore consultant Adria Garneau.  In paragraph five of Garneau's affidavit, she summarizes her conversations with Blue Cross, after Northshore submitted one of its reports, regarding what services were subject to the lifetime maximum. Garneau states that "[Blue Cross's] explanations were not always consistent" and that in her telephone conferences with Blue Cross, "[Blue Cross] took the position, rather emphatically, that Express [Oil's] 2007 SPD had been changed to provide that in-network physician charges were not subject to the lifetime maximum." Aff. Adria Garneau ¶ 5. In paragraph seven of Garneau's affidavit, she states her understanding that Blue Cross was taking the position that the scope of services subject to the lifetime maximum did not change between the 2006 and 2007 SPDs. She then states that if she accurately understood Blue Cross's position, "it is certainly a reversal of the position [Blue Cross] took in [Northshore's] discussion with [Blue Cross] representatives in 2009." Aff. Adria Garneau ¶ 7.

Blue Cross cites to Garneau's deposition in which she testified that Blue Cross consistently asserted to her that in-network physician services should not count towards the lifetime maximum. *See* Depo. Adria Garneau 81:9–81:13 ("Q: . . . Blue Cross has always contended that in-network physician services should not count toward the lifetime maximum, correct? A: That's what they said, yes."); Depo. Adria Garneau 83:6–83:13 (Q: "[Blue Cross has] been consistent stating that out-of-network physician services do count towards the lifetime max, correct? A: Correct."). Blue Cross also cites to a portion of Garneau's deposition where she testifies that Blue Cross told her the 2007

SPD was issued to clarify, and not change, the 2006 SPD.

In response to Blue Cross's argument, Express Oil argues that Blue Cross misunderstands Garneau's affidavit. Express Oil asserts that when Garneau refers to "services" in paragraph five, she is not referring to inconsistencies in Blue Cross's application of in-network physician services to the lifetime maximum, but to inconsistencies generally in what services counted as "Other Covered Services" applicable to the lifetime maximum—*i.e.*, services apart from physician services. Express Oil asserts that paragraph seven's reference to the "reversal of Blue Cross's position" is not directed towards inconsistencies in Blue Cross's position on whether in-network physician services apply towards the lifetime maximum, but instead to inconsistencies between the language of the 2006 and 2007 SPDs. Express Oil further argues that even if Garneau's affidavit was inconsistent with her deposition testimony, the inconsistency does not rise to the level of making her affidavit, or portions of it, a "sham affidavit."

The court concludes that, unlike Blue Cross's interpretation of Glover's affidavit, Blue Cross's interpretation of Garneau's affidavit is mostly accurate. The court agrees with Express Oil that Garneau's statement that "[Blue Cross's] explanations [regarding services subject to the lifetime maximum] were not always consistent" could be read to mean that Blue Cross provided inconsistent explanations for what services applied to the lifetime maximum. Accordingly, the court DENIES Blue Cross's motion to strike that statement in paragraph five.  But the court cannot read Garneau's subsequent statement in paragraph five that "[Blue Cross] took the position [in telephone conferences with Northshore], rather emphatically, that Express [Oil's] 2007 SPD had been changed to provide that in-network physician charges were not subject to the lifetime maximum. . . ., " to mean anything other than that Blue Cross changed its position on whether in-network physician services could apply to the lifetime maximum. Garneau gave a clear answer to an unambiguous

question in her deposition, and now flatly contradicts that answer in her affidavit. Accordingly, the court GRANTS Blue Cross's motion to strike the referenced excerpt in her affidavit, the fifth sentence of paragraph five. The court STRIKES this sentence, and will  not consider it when reviewing the underlying motions for summary judgment.

In replying to Express Oil on paragraph seven, Blue Cross concedes that it *did* change some language between the 2006 and 2007 SPD, but maintains that the changes were intended to clarify the SPDs, and not substantively change the scope of services applied to the lifetime maximum as paragraph seven of Garneau's affidavit implies. The court agrees with Blue Cross's interpretation of this paragraph, despite Express Oil's efforts to paint Garneau's statement as referring to changes between the 2006 and 2007 SPD, as opposed to substantive changes in Blue Cross's position on whether in-network physician services applied to the lifetime maximum. Because the second sentence of paragraph seven of Garneau's affidavit also contradicts the clear answers she gave to unambiguous questions in her deposition, the court also GRANTS Blue Cross's motion to strike the second sentence of paragraph seven. The court STRIKES this sentence and will not consider it when reviewing the underlying motions for summary judgment.

## IV.   STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).   The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e) ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  The moving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings."  *Celotex*, 477 U.S. at 324.  If the

evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, ____ F.3d ____, 2013 WL 425445, *16 (11th Cir. Feb. 5, 2013)  (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* *18.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

30

**V.**     **DISCUSSION**

      *A.*     *All claims against Nesbitt are due to be dismissed*

Nesbitt raises two arguments in its unopposed motion for summary judgment. First, Nesbitt

argues that its Asset Purchase Agreement with ANB bars claims based on ANB's alleged actions or

omissions before May 2007. Second, Nesbitt argues that Express Oil cannot prove that Nesbitt is

liable for any alleged acts or omissions after May 2007. The court agrees, and Express Oil's failure

to respond to Nesbitt's motion while responding to all other pending motions reveals that Express

Oil also does not place much confidence in its claims against Nesbitt.

      *1.*     *The Asset Purchase Agreement bars all claims based on actions or omissions*
          *before May 2007*

Although Blue Cross removed the case based on federal question jurisdiction—that ERISA

preempted Express Oil's state law claims against Blue Cross at the time of removal—Express Oil

only asserts state law claims against Nesbitt. Nesbitt argues that as the purchasing corporation in an

Asset Purchase Agreement, it is not liable for the debts of the selling corporation under Alabama

law.

Alabama law provides that when a corporation purchases the assets of another corporation,

the purchasing corporation generally is not liable, in contrast to a merger where a successor

corporation remains liable for its predecessors' liabilities. *Matrix-Churchill v. Springsteen*, 461 So.

2d 782, 786 (Ala. 1984). Four exceptions exist to this rule: (1) an express agreement exists for the

purchasing corporation to assume the liabilities of the selling corporation; (2) the transaction is a

*de facto* merger or consolidation of the two companies; (3) the transaction is a fraudulent attempt

to escape liability; or (4) the purchasing corporation is a mere continuation of the selling corporation.

*Matrix-Churchill*, 461 So. 2d at 786.

Express Oil has not presented any evidence that any of the four exceptions exist in this case.

Although the Asset Purchase Agreement provided that Nesbitt would assume some of ANB's liabilities, none of the categories of liabilities assumed encompasses Express Oil's claims against ANB. Moreover, Express Oil has neither pointed to any evidence, nor indeed even responded to Nesbitt's brief, showing that Nesbitt's purchase of ANB's assets is a *de facto* merger or a fraudulent attempt to escape liability. Accordingly, the court concludes that Nesbitt did not acquire any liabilities ANB may have incurred toward Express Oil before May 2007.

> 2.   *Express Oil has not shown that Nesbitt was responsible for any of the alleged conduct giving rise to the claims after May 2007*

Express Oil has not produced evidence that any action taken or not taken by Nesbitt after May 2007 gave rise to any of Express Oil's claims in this action. Express Oil obtained the stop-loss insurance from ANB prior to May 2007 and complains of ANB and Wood's actions in procuring and explaining that insurance policy in 2003, well before Nesbitt acquired ANB. In the Asset Purchase Agreement, Nesbitt does not assume any liabilities or obligations of ANB that arose from "any event or circumstance occurring or existing prior to the Effective Time." (Doc .89-1 , at 11).   Express Oil, therefore, has not shown that Nesbitt was responsible for any actions or omissions that gave rise to the claims in this case after May 2007, and the court will GRANT judgment in favor of Nesbitt on all of Express Oil's claims against Nesbitt and DISMISS Nesbitt from this case WITH PREJUDICE.

> B.   *All Claims Against Blue Cross are due to be Dismissed*

Blue Cross argues that the six alleged causes of action asserted against it should be dismissed for various reasons. First, Blue Cross argues that ERISA preempts three of Express Oil's claims: breach of contact, breach of the covenant of good faith and fair dealing, and negligent/wanton plan administration. Alternatively, Blue Cross argues that Alabama law does not recognize a claim for

either breach of the implied covenant of good faith and fair dealing or for negligent/wanton plan administration. Second, Blue Cross argues that it did not breach any fiduciary duty to Express Oil because it had no duty to design the plan and because its administration of the plan was consistent with the SPDs or, at a minimum, constituted a reasonable interpretation of the plan's terms. Third Blue Cross argues that Express Oil's negligent and wanton design claim and its fraudulent suppression claim are both barred by the statute of limitations, or alternatively, fail on the merits.

In response to Blue Cross's motion for summary judgment, Express Oil conceded that summary judgment is due to be granted as to Count III, breach of the implied covenant of good faith and fair dealing, and Count V, negligent or wanton administration and payment of claims. Accordingly, the court GRANTS Blue Cross's motion for summary judgment on Counts III & V. The court addresses the remaining counts below: Count I for breach of fiduciary duty as an ERISA fiduciary; Count II for breach of contract; Count IV for negligent or wanton failure to properly design the plan; and Count VI for fraudulent suppression.

### 1. Is Count II for breach of contract preempted by ERISA?

ERISA's preemption clause, § 514(a), provides that ERISA "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). "[T]he express pre-emption provisions of ERISA are deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987) (internal quotation omitted); *see also id.* (analyzing legislative history of ERISA and quoting a representative who described the "reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans" as ERISA's "crowning achievement") (alterations in original).

Blue Cross argues that § 514(a) preempts Count II of Express Oil's Amended and Recast

Complaint. Count II alleges that "Defendant Blue Cross breached the Agreement that Blue Cross entered into with Express Oil and the Plan." The Amended and Recast Complaint does not state with any specificity which contract was breached, much less any specific provision that gives rise to the damages Express Oil seeks. In its motion for summary judgment, Blue Cross states that the alleged agreement is the ASA, and Express Oil, in its opposition, does not indicate that it intended to assert breach of any other contract.

The ASAs set forth the parties' obligations and responsibilities regarding the plan. The 2003 ASA provided that Blue Cross would "administer the benefits provided by the Plan . . . subject to all of the terms and conditions of the Plan . . . ." Def. Blue Cross Ex. 1 at 1. The 2007 ASA provided that Blue Cross would "exercise the discretionary fiduciary authority to process and adjudicate claims under the Plan." Def. Blue Cross Ex. 2 at 3. The ASAs, thus, indicate that Blue Cross's fundamental responsibility under the ASAs was to administer the plan according to the terms of the plan.

Express Oil's breach of contract claim appears to relate directly to its health benefits plan. Express Oil alleges that Blue Cross misapplied the plan and overpaid the Q claim, an allegation Express Oil bolsters with the reports from Northshore's audit. The success of Express Oil's claim turns on whether Blue Cross properly applied the terms of Express Oil's plan, and not on whether it committed some misconduct apart from the plan in its dealings with Express Oil. Thus, Express Oil's breach of contract claim appears to be preempted by § 514(a) of ERISA because it "relate[s] to [an] employee benefit plan . . . . " 29 U.S.C. 1144(a).

Another district court in the Eleventh Circuit has arrived at a similar conclusion. In *AutoNation*, *Inc. v. United Healthcare Ins. Co*., AutoNation, an employer with a self-funded plan, executed an administrative services agreement with United Healthcare under which United agreed

34

to administer AutoNation's plan for three years. 423 F. Supp. 2d 1265, 1267 (S.D. Fla. 2006). After AutoNation's plan experienced a substantial increase in cost, AutoNation hired an auditor to investigate United's performance under the plan. The auditor concluded that United failed to deliver the value or services that it promised to deliver, and AutoNation sued United alleging, among other claims, breach of contract. *Id.* at 1267–68. The district court, after discussing relevant cases finding both preemption and no preemption, held that no question existed "that the state law claims 'relate[d] to' the ERISA Plan" and were thus preempted by ERISA. *Id.* at 1271.

Express Oil apparently recognizes the close factual similarity between these cases, as it does not attempt to distinguish the facts of this case from *AutoNation*, but instead argues that *AutoNation* does not bind this court. Express Oil also asserts that "strong arguments exist to justify carving this claim out of ERISA and treating it as a state law claim." Pl. Opp. Br. at 31. Express Oil relies on the case of *W. E. Aubuchon Co. v. BeneFirst, LLC*, 661 F. Supp. 2d 37 (D. Mass. 2009) for these arguments. As with *AutoNation*, *Aubuchon* also involved a dispute between an employer and plan administrator, where the employer alleged that the plan administrator had made processing errors that added millions of dollars in additional costs to the plan. *Aubuchon*, 661 F. Supp. 2d at 39. The district court in *Aubuchon* held that the employer's breach of contract claim was not preempted because the employer was challenging provisions of the contract that did not relate to or implicate ERISA—such as the requirement that the plan administrator maintain certain records. *Id.* at 47. Express Oil argues that claims by plans against third party administrators are distinct from claims asserted by participants or beneficiaries because the former category of claims are merely business disputes that do not necessarily affect the relationship between ERISA participants and fiduciaries.

To bolster its argument that the relationship between Blue Cross and Express Oil is "nothing more than a garden variety business dispute," Express Oil also cites to a provision in the ASA

concerning the resolution of audit claims that provides that the parties are to "allocate errors [in making claim payments] among themselves, based on the relative degree of fault of each party." 2007 ASA at 9. Express Oil asserts that "[Blue Cross's] use of the fault based concepts suggests that the disputes should be governed by state common law." Pl. Opp. Br. at 33.

Neither the *Aubuchon* case nor the presence of the provision on resolving audit disputes, however, persuades this court that Express Oil's breach of contract claim does not "relate" to an ERISA plan. In fact, the district court in *Aubuchon* clearly distinguished the nature of the breach of contract claims in its case—breach of contract for failure to meet certain performance standards in the contract—from breach of contract for *paying claims incorrectly*. As the court noted, "Whether a particular claim was, or was not, paid in accordance with the terms of the Plan might require the Court in some circumstances to interpret the Plan to adjudicate the dispute. If such an interpretation were required, it might be that the claim is preempted . . . . But that is not the case here." *Aubuchon*, 661 F. Supp. 2d at 48 (internal citation omitted). Because Express Oil has not sued for the breach of contractual provisions that would solely govern the relationship between *it* and Blue Cross, but instead has sued for breach of contract alleging that Blue Cross paid too much in claims to ERISA plan beneficiaries under the plan, the court finds *Aubuchon* inapplicable.

This case falls into that category distinct from the *Aubuchon* claim—here, the claimed breach arises from Blue Cross incorrectly paying claims. To determine whether Blue Cross incorrectly paid claims, the court will have to interpret the plan. As the *Aubuchon* court foretold, the question of whether a claim was paid in accordance with the terms of the plan "might require" the court to interpret the plan, and thus be preempted. *Aubuchon*, 661 F. Supp. 2d at 48

Similarly, the contractual provision on audit disputes has little bearing in this case. Express Oil is not suing to enforce the audit dispute provision or seeking damages for its breach; if it were,

perhaps it would have a stronger argument that its breach of contract claim is a "garden variety business dispute" that does not relate to an ERISA plan. But where, as here, Express Oil alleges that Blue Cross breached the ASAs by overpaying claims under the terms of the plan, the court concludes that the breach of contract claim "relates to" Express Oil's employee benefit plan, and is, thus, preempted by ERISA and is due to be dismissed.

Accordingly, the court GRANTS Blue Cross's motion for summary judgment as to Count II, breach of contract, because that claim is preempted by ERISA.

> 2.    *Can Express Oil maintain its negligent and wanton design claim against Blue Cross?*

In Count IV of the Amended and Recast Complaint, Express Oil alleges that Blue Cross undertook to design the plan, that Blue Cross negligently or wantonly failed to properly design the plan, and that as a proximate consequence of Blue Cross's conduct, Express Oil and the plan suffered economic losses.

Blue Cross asserts that the statute of limitations bars Express Oil's negligent and wanton design claim. Alabama Code § 6-2-38 provides a two-year statute of limitations for claims alleging liability for negligence. *See* Ala. Code § 6-2-38(*l*) ("All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."). "Under Alabama law, the statute of limitations begins to run when the cause of action 'accrues,' which occurs 'as soon as the party in whose favor it rises is entitled to maintain a cause of action thereon,' even if the 'full amount of damages' is not apparent at the time the legal injury occurs." *Russell Petroleum Corp. v. Environ Prod., Inc.*, 333 F. Supp. 2d 1228, 1232 (M.D. Ala. 2004) (citing *Spain v. Brown & Williamson Tobacco Corp.*, 872 So. 2d 101, 114 (Ala. 2003)). Alabama courts have also held that the "discovery rule" that tolls the statute of limitations for fraud claims does *not* apply to actions based upon allegations of negligent or wanton misconduct. *R.R.*

*Sanders v. Peoples Bank & Trust Co.*, 817 So. 2d 683, 686 (Ala. 2001) (citing Ala. Code § 6-2-3).

Thus, Blue Cross argues that § 6-2-38 bars Express Oil's claim for negligent plan design. In support

of this argument, Blue Cross cites to *Booker v. United American Ins. Co.*, 700 So. 2d 1333 (Ala.

1997), and *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268 (Ala. 1993).

In *Booker*, the plaintiffs, a married couple, met with an employee working for an insurance

agent on May 15, 1991, and asked for a major medical insurance policy. *Booker*, 700 So. 2d at 1335.

The employee indicated to the plaintiffs that he could provide them an ideal policy through United

American, and the plaintiffs, relying on the employee's representation, signed the application for the

policy and started paying premiums. In actuality, the policy was not a major medical policy, but only

a hospitalization policy. After the plaintiffs received the hospitalization policy, they unsuccessfully

attempted to contact somebody at the agent's office to have the policy explained. In April 1993, one

of the plaintiffs was hospitalized and incurred $49,000 in medical bills, only $14,000 of which the

hospitalization policy covered. Four months later, the Bookers filed suit, including a claim against

United American for negligent or wanton supervision of the insurance agent, and for the agent's own

negligent or wanton behavior. The Court stated that "It is well settled that a negligence cause of

action accrues when the plaintiff can first maintain the action, regardless of whether the full amount

of damage is apparent at the time of the first injury." *Id.* at 1340. The Court also cited *Henson v.*

*Celtic Life Ins. Co.* for the rule that a "plaintiff's completion of an application for a health insurance

policy start[s] the running of the two-year limitations period for a negligence action" because § 6-2-

38 does not contain a discovery rule. *Id.* (citing *Henson v. Celtic Life Ins. Co.*, 621 So. 2d at 1273).

The Alabama Supreme Court affirmed the dismissal of the negligence and wantonness claims based

on *Henson* and § 6-2-38 because the claims accrued in May 1991 when the Bookers signed the

application and wrote the check for the policy, and the Bookers did not bring suit until August 1993,

more than two years after the accrual of their claims. *Booker*, 700 So. 2d at 1340.

The court finds little distinction between the analyses in *Booker* and *Henson* and this case. Although the Alabama Supreme Court provides little analysis in these cases, the court agrees with the principle underlying the opinions:  the injury occurred at the moment the plaintiffs entered into an insurance plan that did not contain the protection or coverage that the plaintiff thought it did. Because the injury occurred at that time, the negligence cause of action also accrued at that time, and the court will apply this principle to this case.  Even though the plaintiffs in both *Booker* and *Henson* were individuals, and not a small business with a sophisticated CFO, and even though the plaintiffs did not realize their policies were deficient until more than two years after they received them, the courts held their claims barred by the statute of limitations, relying on the absence of a discovery rule in § 6-2-38.  *See Booker*, 700 So. 2d at 1339-40; *Henson*, 621 So. 2d at 1274. In this case, Express Oil did not realize that its policy was allegedly deficient until more than four years after it switched to the self-funded plan Blue Cross offered, and did not add Blue Cross as a defendant until 2009, six years after it contracted with Blue Cross as a plan administrator.

Express Oil responds to *Booker* and *Henson* by citing two cases and attempting to distinguish *Booker*. The first of the cited cases, *Collins v. Scenic Homes, Inc.*, 38 So. 3d 28 (Ala. 2009), involved claims by residents of an apartment building that was designed by an unlicensed architect in 1982 caught fire in 2004. The residents asserted negligence and wantonness claims against the defendants, alleging that the defendants had failed to construct and maintain a reasonably safe apartment building with adequate safeguards against a fire. The Alabama Supreme Court held that the residents' claims were not barred by the twenty-year statute of repose, explaining that the statute of repose did not begin to apply until the residents had the right to sue after the fire occurred. *Id.* at 35. The Court arrived at this conclusion by relying on previous case law stating that "where the act complained of

does not itself constitute legal injury at the time, but the plaintiff's injury comes only as a result of, and in furtherance and subsequent development of, the act of the defendant, the cause of action 'accrues' . . . . 'when, and only when, the damages are sustained.'" *Id.* (citing *Smith v. Medtronic, Inc.*, 607 So. 2d 156, 159 (Ala. 1992)).

Express Oil also cites to *Williamson v. Indianapolis Life Ins. Co.*, 741 So. 2d 1057 (Ala. 1999), a "vanishing premiums" case, in arguing that it had no legal injury until the Q claim exceeded $1,000,000.  In *Williamson*, the plaintiff had purchased life insurance policies based on an insurance agent's representation that the plaintiff would only have to pay a large premium for ten years, after which the policies "would go into 'auto pilot' and the premiums would vanish . . . .'" *Id. at* 1060. These "vanishing premium" policies were based on the underlying theory that the value of the policies would generate enough income to pay premiums beyond ten years such that the policy would sustain itself. Whether the policies could sustain themselves, however, was based on a variety of factors, and left open the possibility that the insured might have to pay out-of-pocket premiums after ten years. The plaintiff sued before the expiration of the ten-year period when he realized that he would probably have to pay additional premiums after the ten years, and provided evidence that the insurance company knew that "vanishing premium" policies were not viable when it sold the plaintiff his policies. The insurer moved for summary judgment, arguing that the plaintiff could not sue unless and until the insurer actually asked him to pay for out-of-pocket premiums. *Williamson*, 741 So. 2d at 1060.

On rehearing, the Alabama Supreme Court held that the plaintiff had suffered no discernible injury when he filed his action and, therefore, was precluded from suing the insurer. *Williamson*, 741 So. 2d at 1061. The Court noted that, in several other cases, the Court had held that  plaintiffs who had not suffered harm, loss, or injury had no claim to adjudicate, even if their alleged injury was

based on possible future harm. *See id.* at 1060–61; *see also Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala. 1998) (holding that an owner of a sport-utility vehicle could not maintain a lawsuit alleging fraudulent suppression based solely on the risk that her vehicle *might* roll over because of an alleged defect); *Pfizer*, *Inc. v. Farisian*, 682 So. 2d 405, 406, 408 (Ala. 1996) (holding that a plaintiff who received a manufactured heart valve could not recover damages based on speculation that the valve *might* fail, even when that speculation was supported by evidence of valve failures and even when evidence existed that the valve's failure rate was higher than that represented by the defendant). Applying the rationale of those cases, the Court determined that the plaintiff with the vanishing premium policy had no claim until he suffered actual harm, loss, or injury, which the Court held would not occur until the premiums did not "vanish" as promised. *Williamson*, 741 So. 2d at 1061.

Express Oil argues that when the facts of this case are viewed through the prism of *Collins* and *Williamson*, its claim for negligence is not barred by the statute of limitations. Under the holding of *Collins*, a party does not have a cause of action until a legal injury occurs: Express Oil asserts that its claims against Blue Cross are analogous to the "vanishing premium" policies in *Williamson* where the Alabama Supreme Court found the plaintiff did not yet have a legal injury. Express Oil, thus, argues that "[n]o cause of action arose until the contingency occurred and Express [Oil] was required to pay out more than what was covered by the stop loss coverage." Pl. Opp. Br. to Def. Blue Cross. Mot. S.J. at 18. Express Oil attempts to distinguish *Booker* by explaining that "[u]nlike *Booker*, there is no claim here that Express [Oil] was induced to pay for a policy it did not receive." Pl. Opp. Br. to Def. Blue Cross Mot. S.J. at 18.

The court does not find Express Oil's arguments persuasive because Express Oil has not explained why it does not have a legal injury that is distinct from those of the plaintiffs in the *Booker*

and *Henson* cases. The plaintiffs in both *Booker* and *Henson* alleged that an insurance company or its agent negligently sold them a policy that failed to provide the coverage the defendants or their agents had allegedly promised. These claims strongly resemble Express Oil's negligent design claim, where it alleges that Blue Cross, by failing to advise Express Oil on its limited definition of the lifetime maximum, negligently provided Express Oil with a self-funded plan that failed to perform as Express Oil thought it would and instead exposed it to greater risk.  In holding that the plaintiffs in *Booker* and *Henson* were barred by the statute of limitations, the Alabama Supreme Court implicitly determined in both cases that a legal injury occurred at the moment the defendants issued a policy because the plaintiffs were exposed to a risk they thought they were protected against at that moment.  Express Oil has only conclusorily stated that no cause of action occurred at that point, but has not explained why Blue Cross's alleged actions in 2003 did not constitute a legal injury when providing a policy that did not provide the expected coverage constituted injury for the plaintiffs in *Booker* and *Henson.*

Assuming Blue Cross indeed owed a duty to design the plan Express Oil wanted and then breached that duty, the legal injury alleged in Express Oil's negligent plan design claim occurred when Express Oil began using the BlueCard PPO plan as its own self-funded plan in 2003. In reviewing *Williamson*, this court finds the vanishing premium policy cases distinguishable from the facts involving Express Oil's plan and also finds that the Alabama Supreme Court has held that a legal injury can exist between an insured and an insurer at the moment the policy goes into effect.

To arrive at its holding that vanishing premium policies do not give rise to a cause of action, the Court in *Williamson* distinguished the facts of its case from *Boswell v. Liberty National Life Ins. Co.*, 643 So. 2d 580 (Ala. 1994).  In *Boswell*, the plaintiffs alleged fraud claims that arose from switching their cancer insurance policy, even though they had not filed any claims under the cancer

insurance policy at the time of suit.  The plaintiffs in *Boswell* alleged that an insurance agent induced them to switch a cancer insurance policy for a policy that cost more but offered less coverage, contrary to the agent's representation that they would have increased coverage and additional benefits under the new policy.  *Id.*  The Court held that even though the plaintiffs had not yet filed a claim under the policy, they still had a legal injury upon which they could sue, explaining that "even if the insured files no claim, the loss of what the insured paid for constitutes legal damage or a legal injury." *Id.* at 582.  As the Court aptly stated, "The insurer cannot be allowed to profit from its fraud simply because the insured is 'lucky' enough never to have to use the coverage." *Id.*

The court acknowledges that the count in this case is not for fraud, but, nevertheless, finds the logic from *Boswell* applicable to these facts. Express Oil thought it was contracting with Blue Cross to design a plan that had a comprehensive lifetime maximum, and paid Blue Cross a fee to design that plan. Assuming *arguendo* that Blue Cross had a duty to assist Express Oil in the design of the plan and engage in a comprehensive review with Express Oil of what the plan contained, then Blue Cross failed to meet its duty to Express Oil at the moment that the plan went into effect. Whether Express Oil's alleged injury resulted from negligent or fraudulent conduct does not change the fact that the legal injury occurred when Express Oil did not receive the plan for which it thought it had bargained and that it was paying Blue Cross a fee to design. Thus, the court concludes that Express Oil's legal injury occurred in October 2003, when the Express Oil plan took effect and Blue Cross began administering it.  Because Express Oil filed suit against Blue Cross more than two years later, the statute of limitations bars this claim for negligence.

The court now addresses the new duties beyond those involved in plan design that Express Oil appears to have raised for the first time in its responsive brief to Blue Cross's motion for summary judgment. In its responsive brief, Express Oil alleges that Blue Cross had a duty to (a)

43

explain to Express Oil how the lifetime maximum operated and point out its scope and limitations when Express Oil adopted the plan, a duty established from custom and practice; and (b) explain to Express Oil the limited scope of its lifetime maximum and why Express Oil should accept Blue Cross's stop-loss insurance proposals, a duty established by Blue Cross's undertaking to provide stop-loss quotes. Express Oil also includes arguments relating to negligent undertaking—a claim that it never included in its Amended and Recast Complaint—but gives little in the way of explanation as to what "voluntary undertaking" Blue Cross performed in its role as Express Oil's third party administrator.

These alleged duties do not appear to fall within the scope of the claim alleged in Express Oil's Amended and Recast Complaint for negligent or wanton *plan design*. The court agrees with Blue Cross's assertion in its reply brief that "[Express Oil] should be precluded from 'amending' their claims at this stage of the litigation.'" Def. Blue Cross Reply Br. at 18 n. 28. Express Oil initially filed this lawsuit in November, 2008, and twice amended its complaint, with the second amendment occurring in this court in April, 2010. The original Scheduling Order issued in this case further provided Express Oil until October 4, 2010 to amend its pleadings. Although Express Oil did not have the depositions of the expert witnesses or Blue Cross employees at the time the deadline for amending pleadings elapsed, it had Glover's extensive deposition from October, 2009, and ample time to amend its complaint and pursue new theories or to petition the court for leave to amend if later discovery warranted amendment. Therefore, the court will not consider any new negligence claims to the extent Express Oil has sought to argue them in its responsive brief, and has only considered Express Oil's claim that Blue Cross negligently *designed* the plan in considering Blue Cross's statute of limitations argument—an alleged action that occurred and gave rise to legal injury in 2003.

Blue Cross also argues that Express Oil's wantonness claims are barred by the two-year statutory period.[3]  However, upon review of the parties' briefs, the court agrees with Blue Cross that Express Oil "appears to have abandoned its claims for wantonness as it cites no case law or specific facts to support those claims," Def. Blue Cross Reply Br. at 17, particularly when Blue Cross cited *Capstone Building Corp.* in discussing the statute of limitations for wantonness claims in its initial brief. As the Eleventh Circuit has explained, "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia Inc. v. McWane, Inc.*, 627 F.3d 1230, 1239 (11th Cir. 2012) (quoting *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995)).   Accordingly, the court GRANTS Blue Cross's motion for summary judgment as to Count IV for negligent plan design because it is barred by the applicable statute of limitations and for wanton plan design because Express Oil has abandoned its wantonness claim.

### 3.    Can Express Oil maintain its fraudulent suppression claim against Blue Cross?

In Count VI of the Amended and Recast Complaint, Express Oil alleges a fraudulent suppression claim against Blue Cross based on Blue Cross's alleged failure to disclose material facts. Blue Cross moves for summary judgment on the fraudulent suppression claim on multiple grounds,

---

[3] To support this argument, Blue Cross cites *Ex Parte Capstone Building Corp.*, 96 So. 2d 77,79 (Ala. 2012) ("We hereby . . . confirm that claims of wantonness are subject to the two-year statute of limitations found in Ala. Code 1975, § 6-2-38(l)."). The Alabama Supreme Court, however, clarified that its holding would only apply prospectively. *See id.* at 93 ("[W]e adhere to our conclusion that it would be unjust to announce a decision that applied retroactively so as to immediately cut off the right to bring suit upon any claim that had accrued more than two years prior to our original decision and that would not provide a reasonable transition to the rule announced then and affirmed today."). Before the decision in *Capstone Building Corporation*, "a tort claim based on allegations of wanton misconduct was subject to the six-year statute of limitations found in Ala. Code 1975, § 6-2-34(1) . . . ." *Id.* at 79 (citing *McKenzie v. Killian*, 887 So. 2d 681 (Ala. 2004)). Under *Capstone Building Corp.*, Express Oil appears to be able to maintain its claims for wantonness.

arguing that the statute of limitations bars the fraud claim and alternatively that it did disclose all material facts to Express Oil. In its opposition brief, Express Oil does not appear to have responded to Blue Cross's arguments directed to its fraudulent suppression claim, and therefore, that claim is abandoned. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned).

The court need not engage in extensive analysis on why Express Oil cannot maintain its fraudulent suppression claim. The Alabama Supreme Court has clearly and consistently stated that a plaintiff who receives documents in connection with an allegedly fraudulent transaction has the duty to read those documents and investigate facts that should provoke inquiry. *See AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208–09 (Ala. 2008) (summarizing and discussing three prior Alabama Supreme Court cases affirming summary judgment in favor of defendant insurance companies when the plaintiff possessed documents that contradicted an insurance agent's alleged misrepresentations). Specifically as to the claim of fraudulent suppression, "[i]f one receives from a defendant documents that put him on notice of the very facts alleged to have been suppressed, then that defendant cannot have suppressed those facts." *Liberty Natl. Life Ins. Co. v. Ingram*, 887 So. 2d 222, 229 (Ala. 2004) (quoting *Richardson v. Liberty Natl. Life Ins. Co.*, 750 So. 2d 575, 578 (Ala. Civ. App. 1999)).

Similarly, Express Oil also has received several documents from Blue Cross that discuss the limited lifetime maximum, specifically the 2003 SPD, the Benefits Summary, and the subsequent SPDs, for which Glover signed a letter indicating that they were "Approved as Written." Although Glover testified that he did not read some of the larger documents that Blue Cross provided regarding Express Oil's plan, his ignorance as to the contents of those documents does not negate the fact that (a) he received the documents, and (b) they contained a definition of the lifetime maximum that

applied the lifetime maximum to some—but not all—services. The Alabama Supreme Court enforces the duty to read documents and investigate inconsistencies without regard to education and business sophistication; the seemingly bright-line rule should apply to a company of over three hundred employees with a college-educated CFO. Accordingly, this court GRANTS Blue Cross's motion for summary judgment as to Count VI for fraudulent suppression.

4.     *Did Blue Cross breach its fiduciary duty?*

In Count I of its Amended and Recast Complaint, Express Oil alleges that Blue Cross is an ERISA fiduciary; that Blue Cross owed a duty to act in accordance with the prudent person principle and in accordance with the documents and instruments governing the plan; and that Blue Cross violated its fiduciary duty based on a number of actions Express Oil alleges Blue Cross took. In its responsive brief opposing Blue Cross's Motion for Partial Summary Judgment, Express Oil casts Blue Cross's alleged breach of fiduciary duty only in the context of overpayment of claims under Express Oil's plan. *See* Pl. Resp. Br. to Def. Blue Cross Mot. S.J. at 16 ("Count One claims that, after the Plan was instituted, [Blue Cross] as an ERISA fiduciary violated various fiduciary duties, including claims-processing errors that resulted in overpayments and improper payments."); *id.* at 30–31 ("[Express Oil] contends that [Blue Cross] is liable on the overpayment claim, either under Count One, the breach of fiduciary duty claim, or alternatively, on the state law breach of contract claim in Count Two."). In its reply in support of its Motion for Partial Summary Judgment, Blue Cross acknowledges that "it owed a fiduciary duty to administer claims pursuant to the Plan documents." Def. Blue Cross Reply Br. at 26.

Express Oil specifically argues that Blue Cross breached its fiduciary duty by excluding in-network physician services from the Q claim's lifetime maximum. According to Express Oil, the correct interpretation of the arguably ambiguous SPDs is that *all* physician services apply towards

the lifetime maximum. Under this interpretation, the Q claim would have reached the lifetime maximum sooner, and Express Oil's plan would not have had to pay as much in benefits for that claim. The interpretation Express Oil advances is the same position that the Northshore auditors took in their August 3, 2008 report, although Express Oil appears to argue alternatively that the court should adopt the Northshore auditors' conclusion in the August 28, 2008 report. *See* Pl. Br. Opp. Def. Blue Cross Mot. S.J. at 41 ("The only uncertainty is whether [Blue Cross's decision] was wrong to the tune of $277,000 or $84,000.").

Under ERISA, a fiduciary is an entity "with respect to a plan to the extent . . . [it] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets [or] . . . has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(a). ERISA defines the fiduciary's duties in 29 U.S.C. § 1104. According to this section, the fiduciary must discharge its duties under the plan "*solely* in the interest of the participants and beneficiaries and . . . for the exclusive purpose[] of providing benefits to participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A) (emphasis added). ERISA further requires the fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA also requires the fiduciary to discharge its duties "in accordance with the documents and instruments governing the plan" to the extent those documents and instruments are compliant with ERISA. 29 U.S.C. § 1104(a)(1)(D).

In addition, ERISA has a section addressing liability for breach of fiduciary duty. *See* 29 U.S.C. § 1109. Under this section, a fiduciary that breaches its duties "shall be personally liable to

make good to such plan any losses to the plan resulting from each such breach," along with disgorgement of profits and other equitable relief. 29 U.S.C. § 1109. ERISA's section on civil enforcement allows a "participant, beneficiary or fiduciary" to bring an action for appropriate relief under § 1109, *see* 29 U.S.C. § 1132(a)(2), and to "enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or . . . to obtain other equitable relief . . . to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3).

Express Oil asserts in its Amended and Recast Complaint that *it* is a fiduciary that has standing to bring suit under § 1132(a)(2) and (a)(3), and Blue Cross does not contest this assertion. The Eleventh Circuit has explained, however, that § 1132(a)(3) acts as a "'catchall' provision, providing relief only for injuries not otherwise adequately provided for by ERISA." *Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1084–85 (11th Cir. 2004) (affirming a district court's interpretation of § 1132(a)(3)) (citing *Katz v. ALLTEL Corp.*, 985 F. Supp. 1157, 1161 (N.D. Ga. 1997)). The court must evaluate Express Oil's § 1132(a)(2) and (a)(3) claims within the unusual context of an employer claiming that a  claims administrator breached its duties under ERISA by paying <u>more</u> in benefits than it should have.

>           i.     *The Standard Applied in Reviewing Blue Cross's interpretation of the plan*

Express Oil, through the statutory provisions of ERISA, asserts that Blue Cross violated its fiduciary duties by failing to meet the prudent person standard and by failing to discharge its duties in accordance with the documents and instruments governing the plan. In this case, the two alleged violations seem to be one and the same, as the factual root of Express Oil's claim is that Blue Cross allegedly misinterpreted Express Oil's plan by attributing too much of the Q claim towards services that did not count towards the lifetime maximum. Throughout its responsive brief, Express Oil has not alleged that Blue Cross did not act as a prudent person in executing its duties as a claims

administrator, but instead that Blue Cross incorrectly interpreted the ambiguous plan it supplied to Express Oil and caused more to be paid to a beneficiary in benefits than the plan allowed.

This allegation provides an interesting twist, as Express Oil's claim is the opposite of the usual ERISA claim brought by a beneficiary under § 1132(a)(1) to recover benefits due under a plan. Under the current case law in the Eleventh Circuit, an ERISA claims administrator's decision to deny benefits is analyzed under a six-step process that reviews a benefits decision under a *de novo* standard if the administrator does not have discretion in reviewing claims, and an arbitrary and capricious standard if the administrator is vested with discretion to review the claims. *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). Neither party has cited to authority that squarely addresses the inverse situation, which is what Express Oil alleges here—a claim under § 1132(a)(2) that a claims administrator has breached its fiduciary duties by paying more in benefits than it should.

Other courts in the Eleventh Circuit have applied the "stricter" "statutorily-mandated 'prudence' standard" to claims brought by self-funded employers under § 1132(a)(2). *See AutoNation*, 423 F. Supp. 2d at 1272; *Baker Cty. Med. Servs.*, *Inc. v. Brown*, 2005 U.S. Dist. LEXIS 43482, at *16–17 (M.D. Fla. Aug. 24, 2005). Upon review of these cases, the court determines that the prudent person standard does not apply to review of these claims because the claims that Express Oil alleges are distinct from those in *AutoNation* and *Baker County Medical Services* and are more akin to the denial of benefits claims to which the arbitrary and capricious standard applies.

In *Baker County Medical Services*, the plaintiff was a self-funded employer whose reinsurance carrier became insolvent and was unable to reimburse the employer for certain claims its employees incurred. 2005 U.S. Dist. LEXIS 43482, at *9–10. The third party administrator had delayed in submitting one of those claims to the reinsurance carrier because it attempted to obtain

a discount on the claim and had initially applied a fifty percent reduction to the claim, which it later determined was applied in error. After the third party administrator was unable to obtain a discount and had reversed its decision on the penalty, it submitted the claim to the reinsurance carrier for reimbursement; however, by the time the reinsurance carrier received the claim, it had already experienced severe financial difficulties and had suspended all reimbursements. *Id.* at *6–9. Consequently, the plaintiff was not able to obtain reimbursements for the claim, and sued the third party administrator alleging that it had breached its fiduciary duty by attempting to obtain discounts it should have known were unavailable and by incorrectly applying the reduction to the claim; the plaintiff  further alleged that the delay caused by this breach prevented it from receiving reimbursement from the reinsurance carrier.  *Id.*  at *11. The court in *Baker County Medical Services* concluded that the prudent person standard applied in reviewing the third party administrator's actions; because the prudent person standard "essentially tests the reasonableness of [the third party administrator]'s conduct," the evidence the plaintiff had presented created a genuine issue of material fact. *See Baker Cty. Med. Servs.*, 2005 U.S. Dist. LEXIS 43482, at *21.

*AutoNation* involved a similar set of facts as in *Baker County Medical Services*. Although the plaintiffs in *AutoNation* did not allege the same errors as in *Baker County Medical Services*, they alleged generally, based on the report of an auditor, that the third party administrator failed to "deliver the value, level of review, or services contemplated and paid-for" and continued to disregard its obligations even after it was made aware of flaws in its administration of claims.  The plaintiffs' claims included failure to detect excessive overpayments and payments of benefits to terminated employees. *AutoNation*, 423 F. Supp. 2d at 1268. The court in *AutoNation*, in considering a motion to dismiss, denied the motion as to the plaintiffs' breach of fiduciary duty claim, relying on the district court's opinion in *Baker County Medical Services* and its recognition that processing errors

could provide a basis for a claim under ERISA's "prudence" standard." *Id.* at 1272 (concluding that the plaintiffs could state a claim that the third party administrator's improper administration violated ERISA's prudence standard).

Unlike *Baker County Medical Services* or *AutoNation*, however, Express Oil's arguments regarding its ERISA breach of fiduciary duty claim are *not* based on alleged deficiencies in the *processing* of the Q claim, but on the parties' disagreement over the proper interpretation of the BlueCard PPO plan that Express Oil was operating under when it incurred the Q claim. Moreover, Express Oil is not asserting that Blue Cross's administration of the plan was generally flawed, but that Blue Cross's interpretation of one *individual* claim is erroneous and not in accordance with the 2006 and 2007 SPDs. Were Express Oil to have argued that Blue Cross's overpayment resulted from more issues with Blue Cross's *administration* of the plan, such as an error in reporting the proper amount of all claims, then Express Oil's claim for breach of fiduciary duty would have been more akin to the claims alleged in *Baker County Medical Services* and *AutoNation* and the court would have applied the prudent person standard. But because Express Oil's claim for breach of fiduciary duty is based on its argument that Blue Cross misinterpreted the plan in counting services towards the lifetime maximum, the court concludes a different standard applies.

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court explained that "ERISA abounds with the language and terminology of trust law" and that "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Id.* at 110–11. Under *Firestone*, "a trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Id.* at 111. The Court held that, " [A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

The court finds no reason not to apply *Firestone's* trust principles to Express Oil's particular breach of fiduciary duty claim, especially when the validity of Express Oil's overpayment claim turns on the same plan interpretation as an Express Oil employee's claim for a denial of benefits. *See Firestone*, 498 U.S. at 115 ("[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of the terms in the plan at issue."). In fact, were Blue Cross to have denied benefits to Mr. Q, explaining that he had reached the lifetime maximum, Mr. Q could have at least alleged a suit under § 1132(a)(1). Express Oil's claim appears to be the flip side of that coin, and, thus, reviewable under the "arbitrary and capricious standard" if Blue Cross were vested with discretion in reviewing claims.

Express Oil argues, however, that Blue Cross's administration of the Q claim should be reviewed *de novo*. Under *Firestone*, *de novo* review applies unless the benefit plan gives an administrator discretionary authority to construe the terms of the plan. *Firestone*, 498 U.S. at 115. The court reviewed both the 2003 ASA and 2007 ASA, and while it found a specific grant of discretionary fiduciary authority to review claims in the 2007 ASA, it could not find any such grant in the 2003 ASA. *See* 2007 ASA at 3 ("[Blue Cross] will exercise the discretionary fiduciary authority to process and adjudicate claims under the plan."). Because courts are to apply the *de novo* standard of review "[w]hen a plan is silent or ambiguous as to an [a]dministrator's discretionary authority," the court, thus, reviews challenges to Blue Cross's interpretation of the 2003–2006 SPDs *de novo*. *See Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994). But because the 2007 SPD expressly vested with Blue Cross discretionary fiduciary authority to review claims, the court will review Blue Cross's administration of Express Oil's plan for the 2007-2008 policy year, when

the plan paid in excess of $1.5 million for the Q claim, under the arbitrary and capricious standard.

> ii.   *Blue Cross's interpretation of the 2003–2006 SPDs was not de novo wrong*

Express Oil essentially argues that Blue Cross's interpretation of the 2003–2006 SPDs is *de novo* wrong because those SPDs are ambiguous and the Northshore auditors arrived at a different interpretation. The court agrees that the SPDs are not a model of clarity. The definition of "lifetime maximum" in the 2003–2006 SPDs states that the lifetime maximum "applies only to Other Covered Services" and "Non-PPO Physician Services." Immediately below the definition of the lifetime maximum is a table enumerating a non-exhaustive list of "Other Covered Services," with a footnote referring the reader to a later "Other Covered Services" section and explaining that "[m]ost Other Covered Services are paid at 80% of the Allowed Amount after the calendar year deductible is met." While the table listing "Other Covered Services" does *not* include physicians' services, the subsection on "Other Covered Services" referenced in the footnote to the table lists "Physician's Covered Services." The explanation following "Physician's Covered Services" states that "[s]urgery requires preoperative and postoperative care, reduction of fractures and endoscopic procedures, maternity deliveries and heart catheterization." Thus, the definition of lifetime maximum, which relies upon multiple internal cross-references, hardly paints a clear picture of what services apply to the lifetime maximum.

The difficulty in interpreting the plan raises the question of whether Blue Cross's interpretation is *de novo* wrong *if* the plan is ambiguous. Express Oil argues that the court should interpret ambiguities in its favor, citing to Eleventh Circuit law that holds that "application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA." *Lee v. Blue Cross/Blue Shield*, 10 F.3d 1547, 1551 (11th Cir. 1994) (citing *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249 (3d Cir. 1993)). The court, however, questions the applicability

of the *contra proferentem* rule to this case because the application of *contra proferentem* is intended to protect the *beneficiary*, which in this case would be Mr. Q. As the Eleventh Circuit explained, "[The reasoning behind the *contra proferentem* rule] is especially convincing where, as here, an *insured employee* seeks contractual benefits under ERISA, a statute designed to protect the interests of such employees." *Heasley*, 2 F.3d at 1257 (emphasis added). If this court were to interpret the 2006–2007 SPDs to resolve ambiguities in favor of Express Oil, it would be doing so at the expense of the insured employee. Thus, applying the *contra proferentem* rule to claims challenging overpayment as opposed to a denial of payments to employees puts Blue Cross in between a rock and a hard place and creates an inherent conflict in Blue Cross's administration of Express Oil's plan. Given that ERISA was intended to protect the interests of employees, the court concludes that the *contra proferentem* rule should not be available to a self-funded employer if its application adversely affects the rights of a covered employee.

Moreover, even if Express Oil could receive the benefit of the *contra proferentem* rule, the rule only applies if the court determines the SPD is ambiguous. *See Homes of Legend*, *Inc.*, *v. McCollugh*, 776 So. 2d 741, 746 (Ala. 2000) ("[I]f all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem*, any ambiguity must be construed against the drafter of the contract.") (emphasis in original). Closer scrutiny of the 2003–2006 SPDs reveals that the perceived ambiguity is not so blatant as Express Oil asserts, even if the SPDs are not a model of clarity. The definition of the lifetime maximum states that it applies only to "Other Covered Services" and "*Non-PPO Physician Services*," among other enumerated services. The inclusion of "Non-PPO Physician Services" in the list of services that applies towards the lifetime maximum would be rendered meaningless if the court construed the term "Other Covered Services" to include *all* physician services. In fact, the list of services enumerated under "Other Covered

Services" does not even reference unqualified "Physician Services," but includes the term "Physician's *Covered* Services." The court reads that term, with the qualifier "Covered"—which is not included in the term "Non-PPO Physician Services"—to naturally mean that a *subset* of Physician Services are included in the definition of "Other Covered Services." Although the court is at a loss to explain exactly what that subset of services actually includes, it cannot accept Express Oil's and Northshore's interpretation of the SPDs upon a more technical reading of the SPD.

Accordingly, the court concludes that Blue Cross's interpretation of the 2003–2006 SPDs was not *de novo* wrong, particularly when rejecting the *contra proferentem* rule intended to protect the employees covered by the plan.[4]

> iii.   *Blue Cross's interpretation of the 2007 SPD was not arbitrary and capricious*

Because the 2007 SPD specifically vested Blue Cross with the discretionary fiduciary authority to review claims, the court will review Blue Cross's administration of Express Oil's plan for the 2007-2008 policy year under the arbitrary and capricious standard. "Under the arbitrary and capricious standard of review, the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision." *Oliver v. Coca Cola Co.*, 497 F.3d 1181, *vacated in part on petition for reh'g*, 506 F.3d 1316 (11th Cir. 2007). Although the 2003 SPD defines the lifetime maximum in general terms, the 2007 SPD's definition of lifetime maximum specifically includes out-of-network physician services as applying toward the lifetime maximum. *See* 2007 ASA at 9 ("The lifetime maximum generally applies to services or supplies that

---

[4] The court also is not persuaded by Express Oil's attempts to paint Blue Cross's conduct during the audit as "arbitrary." Whether Blue Cross was slow to respond to Express Oil and Northshore's requests for records or did not produce consistent and accurate records does not affect whether Blue Cross breached a fiduciary duty by misinterpreting the SPDs, but is an issue that relates to Blue Cross's duty of care to administer the plan as adjudged under the prudent person standard. Express Oil did not advance this argument in its brief, however, and the court thus declines to consider it.

are subject to the calendar year deductible . . . . The following are some examples that generally apply to the lifetime maximum: . . . Out-of-network physician services."). That Blue Cross had a reasonable basis for interpreting the 2007 SPD to exclude in-network physician services from the lifetime benefit is supported by Northshore's modification to its audit report, which it re-issued on August 28, 2012, to incorporate the 2007 SPD and exclude in-network physician services during the 2007–2008 policy year from the calculation of the lifetime maximum.

Express Oil argues at length that the 2007 SPD is unintelligible and that one "would have to be a mind reader" to figure out the 2007 SPD. Pl. Opp. Br. to Def. Blue Cross Mot. S.J. at 39. Despite offering these subjective observations of the 2007 SPD, Express Oil does not offer any authority stating that Blue Cross breached a fiduciary duty by drafting and administering claims under an allegedly ambiguous plan document, particularly when the 2007 ASA placed upon Express Oil the duty to "ascertain that the [2007 SPD] accurately and fully describes the benefits that the Employer intends the Claims Administrator to provide or Administer." 2007 ASA at 2; *see also* 2007 ASA at 5 ("[As a Plan Sponsor] the Employer exercises non-fiduciary discretion concerning the design of the Plan."). Moreover, as explained in the preceding section, to the extent the court would apply *contra proferentem*, it would construe ambiguities in favor of the insured employee.

Accordingly, the court concludes that Blue Cross's interpretation of the 2007 SPD was not arbitrary and capricious.

   *iv.*   *Conclusion on Express Oil's claim against Blue Cross for Breach of Fiduciary Duty*

The court finds that the particular breach of fiduciary duty alleged by Express Oil under § 1132(a)(2) for overpayment of benefits should be reviewed under the same arbitrary and capricious standard enunciated by the Supreme Court in *Firestone* and applied by the Eleventh Circuit for denial of benefits claims under  § 1132(a)(1). Under this standard, the court concludes that Blue

57

Cross did not breach a fiduciary standard based on its interpretation of the SPDs in administering the Q claim. Accordingly, the court  GRANTS Blue Cross's motion for summary judgment as to Count I for breach of fiduciary duty.

### 5. Conclusion on Blue Cross's motion for summary judgment

Blue Cross has shown that no genuine issues of material fact exist that would preclude it from summary judgment on all claims Express Oil alleged against Blue Cross in the Amended and Recast Complaint. Accordingly, the court GRANTS Blue Cross's Partial Motion for Summary Judgment in its entirety and GRANTS JUDGMENT in favor of Blue Cross and against Express Oil. Blue Cross remains in the case because of its breach of contract counterclaim against Express Oil.

### C. Claims Against ANB and Wood

Unlike Blue Cross, ANB and Wood only move for partial summary judgment on two of the counts alleged against them in the Amended and Recast Complaint. Specifically, ANB and Wood move for summary judgment on Count VII for negligent procurement of insurance, arguing that Express Oil cannot prove that it could have procured stop-loss insurance that would have covered the Q claim. ANB and Wood also move for summary judgment on Count XII for breach of fiduciary duty, asserting that insurance brokers or agents are generally not regarded as fiduciaries unless they have a special relationship of trust and confidence with a plaintiff, and arguing that no such relationship exists in this case.

### 1. Did ANB and Wood negligently procure insurance?

Express Oil claims that ANB and Wood's failure to procure appropriate stop-loss coverage was  negligent.[5] ANB and Wood assert that they are entitled to summary judgment on this count because Express Oil cannot establish that ANB and Wood could have  procured additional coverage

---

[5] Express Oil has abandoned its wantonness claim. (Doc. 105, at 12).

under the stop-loss policy or an entirely different stop-loss policy to protect Express Oil from the costs it incurred on the Q claim.

"[T]o prevail on a claim of negligent procurement, the plaintiff must prove that the coverage obtained was not the coverage requested." *Sudduth v. Equitable Life Assur. Soc'y,* 2007 U.S. Dist. LEXIS 63174, at *18 (S.D. Ala. 2007) (citing *Kanellis v. Pacific Indemnity Co.*, 917 So. 2d 149, 155 (Ala. Civ. App. 2005)). "Like any negligence claim, a claim in tort alleging a negligent failure of an insurance agent to fulfill a voluntary undertaking to procure insurance, . . . requires demonstration of the classic elements of a negligence theory, i.e., '(1) duty, (2) breach of duty, (3) proximate cause, and (4) injury.'" *Kanellis,* 917 So. 2d at 155 (citing *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992)).

An insurer has no duty to procure insurance that he "could not *actually* obtain." *Hawk v. Roger Watts Ins. Agency*, 989 So. 2d 584, 591 (Ala. Civ. App. 2008). In *Hawk*, the court ruled that the insurer had no duty to procure insurance coverage for after-market modifications on an automobile because "no other agent could have procured [coverage] for him." *Id.* Similarly, in this case Express Oil has not produced evidence that ANB and Wood could have procured stop-loss insurance that would have prevented the damages that Express Oil now claims.

During the first two coverage years, Express Oil was reimbursed under the stop-loss policy on the Q claim, but in the third policy year, Express Oil incurred claims in excess of the policy's $1,000,000 ceiling. During the first two policy years, Express Oil did not assert a claim for negligent procurement of insurance because it suffered no recoverable damage.[6] In the third policy year,

---

[6] During the first two policy years, Express Oil may have had a claim that it could have asserted for negligent failure to procure the coverage and protection it thought it was receiving under the plan, but it did not assert it presumably because it had not yet suffered any monetary damages as a result of the gap in coverage between the lifetime maximum and the stop-loss policy.

Express Oil claims damages because it did not have sufficient stop-loss coverage to be reimbursed for all the payments it made on the Q claims after the exhaustion of the required deductible.

The stop-loss coverage provided under Express Oil's policy procured by ANB and Wood and any other policy that they could have procured for Express Oil, no matter the coverage amount, would have been subject to review by its underwriting department each policy year. Therefore, any insurer could have "lasered" the Q claim or excluded coverage for the Q claim by the third policy year, the year in which Express Oil incurred its losses at issue. Thus, Express Oil cannot now claim that ANB and Wood definitively *could* have but did not obtain a specific stop-loss policy that would have covered the Q claims in the third policy year.[7]

The testimonies of Wayne Bowling, Express Oil's expert, and Richard Yeary, Blue Cross's expert, support the assertion that obtaining different or additional stop-loss insurance would not necessarily have covered all of the Q claims. (Docs. 89-18, 19, 20, 21, 22). In fact, Unimerica did exclude coverage for any Q claims in October 2008 when underwriting Express Oil's new $2,000,000 stop-loss policy. (Doc. 89-23, at 42). Express Oil has presented no evidence that "but for" ANB and Wood's alleged negligence in procurement of the $1,000,000 stop-loss policy, Express Oil would not have suffered the damages it now claims. Because Express Oil's expert could only testify as to whether different or additional stop-loss insurance *might* have decreased Express Oil's out of pocket expenses on the Q claim, Express Oil has not produced sufficient evidence that ANB and Wood's failure to provide different or additional coverage caused the damages at issue in this case.

---

[7] ANB and Wood correctly point out in their Reply brief that courts differ regarding whether they classify a plaintiff's failure to establish the availability of insurance coverage as a lack of duty, breach, causation, or damages. Regardless of how it is characterized, in *Hawk,* the Alabama Court of Civil Appeals required that the plaintiff produce evidence that the insurance coverage sought was in fact available in the market.

Because Express Oil fails to produce any evidence of causation, it cannot present a prima facie case of negligent procurement of insurance. Thus, the court will GRANT summary judgment in favor of Wood and ANB on Count VII and DISMISS WITH PREJUDICE Count VII of Express Oil's Amended and Recast Complaint.

### 2. Did ANB and Wood breach their fiduciary duty?

ANB and Wood argue that Express Oil's breach of fiduciary duty claim fails as a matter of law because no fiduciary relationship existed between the parties. Although insurance agents and brokers are generally not regarded as fiduciaries under Alabama law, the Alabama Supreme Court has recently defined a fiduciary or confidential relationship as follows:

> A confidential relationship is one in which one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other . . .

*DGB, LLC v. Hinds*, 55 So. 3d 218 (Ala. 2010) (internal citations omitted). This court recognizes that this kind of fiduciary relationship existed between Express Oil and ANB and Wood. Express Oil executives Brooks and Glover trusted Pardue and thus ANB and Wood, ANB's employee benefits salesperson, to counsel and advise Express Oil about the procurement of a self-funded health plan and stop-loss insurance to cover its liability under the self-funded plan. Additionally, before Express Oil even considered a self-funded health plan, Pardue served as Express Oil's agent for its property insurance, casualty insurance, and worker's compensation coverage. (Doc. 107-22, at 12-13).  ANB and Wood do not dispute that a close advisory relationship existed between the parties, and they recognize that ANB wanted its agents to act as "trusted advisors" as opposed to merely insurance salesmen. *Id.* at 78-79.

Wood and ANB argue that this case is similar to *Maloof v. John Hancock Life Ins. Co.,*

61

60 So. 3d 263 (Ala. 2010). In that case, the Supreme Court of Alabama affirmed the grant of

summary judgment to an insurance agent on a claim of breach of fiduciary duty because no

fiduciary relationship existed between the insured and the agent. That case is distinguishable

from this one because the insureds' testimony in *Maloof* proved that they "certainly did not view

their relationship with [the insurance agent,] though cordial and long-standing, as anything

special or outside the typical salesperson-customer relationship." *Id*. at 274. By contrast, in this

case, Express Oil has demonstrated that its executives placed trust and confidence in ANB and

Wood in developing a self-funded health plan and in procuring the appropriate stop-loss

insurance to protect Express Oil under the self-funded plan. This type of relationship where ANB

and Wood inspired confidence in Express Oil that they would act in good faith for its interests

goes beyond that of a mere insurance agent/customer relationship like in *Maloof.*

 Express Oil has produced evidence that ANB and Wood breached their fiduciary duty by

failing to adequately explain to Express Oil how the stop-loss coverage interfaced with Blue

Cross's unusual lifetime maximum in its self-funded plan and how Express Oil could cap its total

liability with a comprehensive lifetime maximum offered by Blue Cross. Express Oil has also

presented evidence that ANB and Wood's breach caused it the damages at issue in this action.

ANB and Wood do not raise any arguments regarding the breach, causation, or damages

elements of the breach of fiduciary duty claim in their Motion for Partial Summary Judge or their

Reply.

 Express Oil has produced evidence sufficient to show a fiduciary relationship existed

between ANB and Wood and Express Oil and resulting damages that were caused as a breach of

that relationship. Thus, the court will DENY ANB and Wood's motion for summary judgment on

Count XII for breach of fiduciary duty.

## VI. CONCLUSION

For the reasons more fully stated above, the court will GRANT IN PART and DENY IN PART Blue Cross's Motion to Strike. The court will GRANT IN ITS ENTIRETY  Nesbitt's Motion for Summary Judgment; ENTER JUDGMENT in favor of Nesbitt and against Express Oil on Counts VII, VIII, XI, XII, XIII, and XIV; and DISMISS Nesbitt as a party to this action WITH PREJUDICE. The court will GRANT IN ITS ENTIRETY  Blue Cross's Motion for Partial Summary Judgment and ENTER JUDGMENT in favor Blue Cross and against Express Oil on Counts I, II, III, IV, V, and VI.[8]  The court will GRANT ANB and Wood's Motion for Partial Summary Judgment on Count VII but DENY ANB and Wood's Motion for Partial Summary Judgment on Count XI. Counts VIII, IX, X, XI, and XII against Wood remain before the court; Counts VIII, XI, XII, XIII, and XIV against ANB remain before the court; and Blue Cross's counterclaim against Express Oil remains before the court. The court will enter an order simultaneously to that effect.

DONE and ORDERED this 27th day of March, 2013.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[8]  The court grants summary judgment for Blue Cross on all of the claims Express Oil asserts against Blue Cross but does not address the breach of contract counterclaim Blue Cross has asserted against Express Oil.

63